**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary, U.S. Department of the Interior, et al., Defendants.**

**No. CIV.A. 03–1393(JR).**

United States District Court, District of Columbia.

Aug. 20, 2004.

John F. Kostyack, Mary Randolph Sargent, National Wildlife Federation, Washington, DC, for Plaintiffs.

Adam J. Siegel, Eric G. Hostetler, Mark Arthur Brown, U.S. Department of Justice, Washington, DC, for Defendants.

Francis A. Vasquez, Jr., White & Case LLP, Washington, DC, Frank Edward Matthews, Hopping Green & Sams, P.A., Tallahassee, FL, for Intervenor–Defendant.

### *MEMORANDUM*

ROBERTSON, District Judge.

Three conservation groups, the National Wildlife Federation, the Florida Wildlife Federation, and the Florida Panther Society, challenge the U.S. Army Corps of Engineers' (Corps) issuance to Florida Rock Industries of a Clean Water Act "dredge and fill" permit for the operation of a limestone mine on a 6000 acre site near Ft. Myers, Florida. Plaintiffs assert that mining operations on that site will unacceptably reduce the habitat of the endangered Florida panther. They have sued the Corps of Engineers and the U.S. Fish and Wildlife Service (FWS), which issued the Biological Opinion upon which the permit is based, alleging violations of the Endangered Species Act, the National Environmental Policy Act, the Clean Water Act, and the Administrative Procedure Act. Florida Rock has intervened as a defendant. All parties have filed motions for summary judgment.

After reviewing the arguments of the parties and the records of the agencies' decisions, I find that the Biological Opinion (BiOp) issued by FWS is "arbitrary and capricious" within the meaning of the Administrative Procedure Act, and therefore invalid, because FWS failed to make or articulate a rational connection between the record facts and its "no jeopardy" decision and failed to provide a proper analysis of the cumulative impact of development upon the panther. These findings mean that the Environmental Assessment and Statement of Findings (EA/SOF) issued by the Corps, which relies heavily upon the invalid FWS biological opinion, is itself invalid, as is the dredge and fill permit, which depends for its validity upon the environmental assessment and statement of findings. The plaintiffs' motion for summary judgment will therefore be granted in most respects, the dredge and fill permit invalidated, and the BiOp and EA/SOF remanded to the agencies that issued them.

The reasons for these findings and conclusions are set forth below.

## 1. FACTUAL BACKGROUND

The Florida panther (*Puma concolor coryi*), a subspecies of cougar, was listed as endangered in 1967. See 32 Fed.Reg. 4001. Large carnivores, such as the Florida panther, are thought to be critical to the maintenance of healthy ecosystems. See BiOp for the proposed Fort Myers Mine # 2 in Lee County, Florida (Jan. 30, 2002), Admin. Rec. (AR) Vol. 3, Tab 98, at 16. The Florida panther was once found throughout the southeastern United States, but hunting and habitat destruction over the last two centuries have drastically reduced its population and its range. The single confirmed reproducing population of about 78 Florida panthers that exists to-

day has a 2.2 million acre range in south Florida. *Id.* at 12, 17. The largest contiguous panther habitat is the Big Cypress National Preserve/Everglades ecosystem, although suitable habitat extends into other areas of south Florida. *Id.* at 17. It is estimated that approximately half of the habitat used by the panther is located on privately-owned land. *Id.* at 12.

The adult panther is a largely solitary, nocturnal animal. Research indicates that its preferred habitat is native upland forest, a vegetation type that attracts important panther prey, but this conclusion is based on daytime radio collar (telemetry) studies, which may not accurately reflect the types of habitat the panthers prefer during their more active, nighttime hours. *Id.* at 13–14. Male panthers tend to have a larger home range than females. *Id.* at 13. FWS estimates that a minimum of 50 breeding adults is necessary to maintain a viable population. Estimates in the record put the panther population at 78, *id.* at 19, of which at least 15 are non-breeding juveniles. *See* McBride, Current Panther Distribution (Nov.2001), AR Vol. 2, Tab 44, 3–4.

Three basic planning documents in the record deal with the Florida panther:

- In 1986, an inter-agency committee, whose members represented FWS, the Florida Game and Fresh Water Fish Commission, and the National Park Service, convened to coordinate recovery planning. These agencies formed a habitat preservation working group in 1991 to develop a comprehensive plan to protect the panther's habitat. The working group published a **Habitat Preservation Plan (HPP)**, which used telemetry data and other sources to select land for acquisition and/or protection. HPP, AR Vol. 3, Tab 2, at iii. The HPP classified target lands as either Priority 1 ("lands frequently used or high quality habitat") or Priority 2 ("lands less frequently used or low quality habitat") and deemed both types of lands to be "essential" the maintenance of a self-sustaining population of panthers. *Id.* at 33–34.

- In May 1999, FWS included an updated recovery plan for the panther as part of its **Multi–Species Recovery Plan (MSRP)**. FWS, South Florida MSRP, AR Vol. 3, Tab 37, at 4–127—4–128. The MSRP acknowledged that the HPP's priority scheme identified 374,868 hectares of occupied and potential panther habitat "considered essential to maintaining a minimum viable population of 50 breeding adult panthers in South Florida." *Id.* The MSRP also identified habitat loss, urbanization, and agricultural expansion as central threats to the panther. *Id.* at 4–117, 4–127—4–128.

- Panther habitat was also identified as part of the **Southwest Florida Final Environmental Impact Statement (SWFEIS)**, a document issued in July 2000 by the Corps. AR Vol. 3, Tab 146, App. H, Map 17.

Florida Rock Industries ("Florida Rock") wishes to open a limestone mine on a 6000 acre site known as Fort Myers Mine # 2, located near Ft. Myers, just to the south of the Southwest Florida International Airport and Florida Route 82. BiOp, at 10–11. The site is located within the Corkscrew Regional Ecosystem Watershed (CREW), and within an area designated as Priority 2 land in the HPP and identified as panther habitat in the SWFEIS. According to the telemetry data in the administrative record of this case, one radio-collared panther (# 92) was recorded on the project site in May of 2001. *Id.* at 18. Four other panthers have been recorded within two miles of the site, and FWS determined it was "reasonable to expect that they too would have used the project site at one time or anoth-

er." *Id.* According to the same data, one radio-collared panther and three uncollared panthers populated the CREW Ecological Unit, representing at least five percent of the known panther population. *Id.* at 19.

The Florida Rock site includes over 2304.5 acres of jurisdictional wetlands and 3766.1 acres of uplands. *Id.* at 10. As currently planned, the mine will directly impact 3,677.0 acres (approximately 61 percent of the site), of which 334.1 are wetlands. (Fill material will be deposited into 57.6 acres of jurisdictional wetland, while 276.5 acres of jurisdictional wetlands will be excavated.) Because the mine plan involves the filling of jurisdictional wetlands, Florida Rock must have a dredge and fill permit under Section 404(b) of the Clean Water Act. Florida Rock duly filed its application for such a permit with the Corps on Sept. 30, 1997. The Corps issued a public notice about the application on March 9, 1998, and notified interested parties and agencies. EA/SOF for Permit No. 199402492(IP–JB) (Feb. 6, 2003), at 3.

As originally filed, Florida Rock's mining plan made little or no provision for conservation, and both FWS and the Environmental Protection Agency (EPA) objected to it. The EPA recommended denial because the plan did not adequately mitigate the expected wetlands impacts, while FWS objected because the plan would cause unacceptable damage to the aquatic environment and might affect the panther and other endangered species. BiOp, at 2, 6. On September 19, 2001, the Corps and FWS initiated formal consultation over the endangered species impacts of the mine. *Id.* at 9. Eventually, Florida Rock agreed to establish a 802–acre "wildlife corridor" on the eastern portion of the property as "compensatory mitigation" for the impacts to the wetlands. The corridor would be managed as part of the CREW lands. *Id.* at 9. In addition, a large wetland feature on the western side of the site (the 1,050.0 acre "western slough") will remain undisturbed. *Id.* at 11. The EPA withdrew its objections based on these changes, EA/SOF, at 8, and on February 3, 2002, FWS issued its BiOp, which concluded that the proposed mine would not jeopardize the panther (a "no jeopardy" opinion).

Plaintiffs submitted letters to the Corps during June and October of 2002, expressing concern about the contents of the BiOp. The Corps forwarded these letters to Florida Rock. EA/SOF, at 8–9. In August, Florida Rock responded to the letters, arguing that state and local authorities had thoroughly reviewed the issues and that plaintiffs' letters made references to non-peer reviewed literature that the Corps need not credit.[1] *Id.* Thereafter, on February 6, 2003, expressly relying on the BiOp, the Corps issued its EA/SOF, finding that the project satisfied the requirements of the CWA. In addition, pursuant to the National Environmental Policy Act (NEPA), the Corps concluded that a full Environmental Impact Statement (EIS) was not necessary. The contents of the BiOp and the EA/SOF will be discussed in greater detail below. Plaintiffs filed this lawsuit on June 26, 2003.

---

1. Plaintiffs moved to supplement the record with documents related to a suit filed by a FWS employee against the FWS in early 2004. That suit alleges that FWS violated the Data Quality Act by failing to properly identify panther habitat, analyzing data selectively, and using inappropriate analytical models. See Docket, No. 28, Ex. 1. Plaintiffs in this action argued that the documents would aid my understanding of the "complex scientific issues" in the case. I permitted the documents' inclusion in the record of this case— but not as part of the Administrative Record— along with responsive documents submitted by defendant. Docket, No. 31. I have not relied upon these documents in reaching my decision on the motions for summary judgment.

## 1. DISCUSSION

In order to operate the mine as planned, Florida Rock must discharge overburden (the undesired material that lies above the valuable limestone deposit) into a wetland within the jurisdiction of the Corps of Engineers. The Clean Water Act (CWA) prohibits the discharge of pollutants, including dredge and fill material, into the waters of the United States (which includes most wetlands) without a permit. 33 U.S.C. §§ 1311(a), 1362(6). Under CWA section 404(b), the Corps has the authority to permit such discharges of fill into wetlands, provided the activity otherwise comports with the requirements of the CWA. *Id.* § 1344. In reviewing a 404(b) permit application, the Corps must apply binding guidelines developed by the Corps and the EPA. Section 404(b) Guidelines for Specification of Disposal Sites for Dredge or Fill Material, 45 Fed.Reg. 85344 (Dec. 24, 1980) [hereinafter "Section 404(b) Guidelines"]. Under the Section 404(b) Guidelines, the Corps must determine, among other things, whether the permitted activity will violate the ESA. *Id.* at § 230.30. If the ESA will be violated, the Corps cannot issue a section 404(b) permit. *See* 16 U.S.C. § 1536(a)(2). Because the Corps' issuance of a 404(b) permit relied in large part on the BiOp to determine whether the project complied with the ESA, the analysis begins with an examination of the adequacy of the BiOp itself.

### a. FWS's issuance of the Biological Opinion was arbitrary and capricious.

The central enforcement provision of the ESA operates to prohibit federal agencies from authorizing, funding, or otherwise carrying out any action that is likely to "jeopardize" the continued existence of an endangered species. 16 U.S.C. § 1536(a)(2). An action will cause jeopardy if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Any agency must evaluate the effect of a proposed project requiring a federal permit to determine the effect of the project on the species' chances of survival and recovery. This evaluation must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

The first step in the ESA enforcement process is for the action agency (the agency authorizing the project via permit—in this case the Corps) to determine if the proposed action is "likely to adversely affect" an endangered species. 50 C.F.R. § 402.14. If the answer to this question is "yes" for any endangered or threatened species, the action agency must formally consult with FWS. *Id.* This consultation process results in the issuance by FWS of a BiOp that evaluates the effects of the proposed action and determines whether or not the action will jeopardize a listed species. *Id.*

When preparing a BiOp, FWS must (1) "review all relevant information," (2) "evaluate the current status of the listed species," (3) and "evaluate the effects of the action [2] and cumulative effects on the listed species," 50 C.F.R. § 402.14, using "the best scientific and commercial data avail-

---

**2.** "Effects of the action" is defined as the "direct and indirect effects on the species or critical habitat, together with the effects of other activities that are interrelated or inde- pendent with that action that will be added to the environmental baseline." 50 C.F.R. § 402.02.

able," 16 U.S.C. § 1536(a)(2). *See also Greenpeace v. Nat'l Marine Fisheries Serv.,* 80 F.Supp.2d 1137, 1149–50 (W.D.Wash.2000) (remand where agency failed to "meaningfully analyze" the risks to the species and the key issues). The BiOp represents FWS's judgment about whether the proposed action complies with the ESA.

A "no jeopardy" determination is subject to review under the APA's arbitrary and capricious standard. 5 U.S.C. § 706; *see Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 685 (D.C.Cir.1982). A reviewing court must determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 686. The court is not to substitute its judgment for that of the agency. *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Because FWS is the government agency with primary responsibility over protection of listed species, FWS is given some additional discretion to make jeopardy determinations. *Nat'l Wildlife Fed'n v. Coleman,* 529 F.2d 359, 375 (5th Cir.1976). But, the presumption of agency expertise may be rebutted if the agency fails to articulate "a rational connection between the facts found and the choice made."

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 88, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).[3]

i. *FWS failed to make a rational connection between the facts in the record and its no jeopardy conclusion.*

Upon a superficial review, the BiOp appears to offer several grounds for its conclusion that the operation of the Florida Rock mine will not jeopardize the panther: (1) that the panther population is already large enough to remain viable; (2) that the wildlife corridor planned for the eastern portion of the mine site will alleviate some of the negative effects of the project; (3) that the disturbance will have little effect on the recovery rate of the panther (disturbance severity); and (4) that the acreage disturbed is only a small fraction of the total acreage of panther habitat (disturbance intensity). Upon closer examination, however, only the last rationale (disturbance intensity) could possibly form the actual basis for the no jeopardy conclusion.

First, in its briefs and at oral argument, FWS has made it clear that the agency did not rely upon population analysis in reaching its no jeopardy conclusion.[4] Tr., Jul. 6, 2004, at 42:12–14. Second, FWS states that the no jeopardy conclusion did not

---

**3.** *See also Pyramid Lake Paiute Tribe v. United States Dept. of the Navy,* 898 F.2d 1410, 1414 (9th Cir.1990) (agency action may be arbitrary or capricious if the agency fails to consider the relevant factors, and it may be overturned if there is no rational connection between the facts found and the choice made); *see, e.g., Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir.2001) (invalidating BiOp and remanding due to agency's failure to consider relevant factors); *Am. Rivers v. United States Army Corps of Eng'rs,* 271 F.Supp.2d 230, 253–57 (D.D.C.2003) (granting preliminary injunction based on

likelihood that FWS's issuance of a BiOp violated the ESA where no jeopardy finding was "premised on a condition that is virtually certain not to occur" and FWS failed to adequately and reasonably explain its departure from previous conclusions).

**4.** Nor could it credibly have done so: the BiOp states that the estimated 78 panthers now living in south Florida are more than the 50 adult panthers needed to ensure a viable population, without noting or providing any analysis of the fact that the population estimate of 78 includes at least 15 juveniles.

rely upon the existence of the wildlife corridor, Gov't Mot., at 20, and asserted at oral argument in court that the corridor is simply an additional benefit of the project.[5] Tr., at 39:12–15. The third possible basis for the no jeopardy conclusion, disturbance severity, is discussed as a theoretical matter but is never actually calculated in the BiOp.[6] BiOp, at 28. This leaves disturbance intensity as the only basis for the no jeopardy finding.

■ "Disturbance intensity" is simply the quotient of impacted acreage (5268 acres) divided by the entire estimated range of the panther (2.2 million acres). FWS performed this simple calculation and came up with a disturbance intensity of 0.2 percent.[7] BiOp, at 28. Applied to the local, CREW Ecological Unit, the disturbance intensity would be 4.3 percent of CREW. As a function of the typical size of a male and female panther, the disturbance intensity would be 4.1 percent and 11.0 percent, respectively. *Id.* So far, so good—but the FWS "analysis" abruptly ends with this simple exercise in division. The BiOp makes no effort to discuss what these percentages mean for the panther. That omission is a clear failure to make "a rational connection between the facts found and the choice made." *Baltimore Gas & Elec.*, 462 U.S. at 88, 103 S.Ct. 2246.

ii. *FWS failed to provide a proper analysis of cumulative impact of development upon the panther.*

In preparing a Biological Opinion, FWS must evaluate the "cumulative effects" on the listed species, 50 C.F.R. § 402.14. Cumulative effects are "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." 50 C.F.R. § 402.02. The cumulative effects section of the BiOp states, in its entirety:

Cumulative effects include the effects of future State, tribal, local or private actions that are reasonably certain to occur in the action area considered in this Biological Opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation prior pursuant to section 7 of the ESA.

Anticipated future actions in the action area that will eliminate, fragment, or degrade panther habitat include the issuance of SFWMD permits. The SFWMD is responsible for permitting the construction, alteration, operation, maintenance, removal and abandonment of surface water management systems within its jurisdictional boundaries (SFWMD 1996). The SFWMD has issued 382 surface water management and ground water use permits for agricultur-

5. Plaintiffs present persuasive arguments based on evidence in the record that FWS actually did rely upon the existence of the wildlife corridor in reaching a no jeopardy finding. Nevertheless, defendants are entitled to frame their case as they see fit. The practical effect of the federal defendants' position, however, is to leave the entire weight of the no jeopardy conclusion standing on a single, very thin, reed.

6. Disturbance severity is defined as a measure of the effect of a disturbance as a function of the recovery rate. BiOp, at 28. The BiOp explains that genetic restoration is improving

the reproductive capabilities of the panther. Then, instead of estimating a recovery rate or analyzing how the disturbance will affect recovery, the BiOp proclaims that "[t]he proposed action is a negligible faction of the 99 percent range-wide reduction that resulted in the listing of the panther as endangered." *Id.* This almost *non-sequitur* conclusion cannot form the basis of a no jeopardy finding.

7. Not, as the BiOp says, 0.002 percent, which was a typographical error. *See* Gov't Mot., at 16 n. 4.

al projects covering 948,480 acres (384,-000 hectares) of the Immokalee Rise Physiographic Region (Mazzotti *et al.* 1992). Many of the permits have not been executed and the Service is therefore unable to ascertain the extent and consequence of proposed agricultural developments. Under a worst case scenario this would equal a loss of 64 percent of the potential panther habitat in private ownership. The number of panthers affected cannot be determined since these lands have never been surveyed for panthers.

BiOp, at 30–31.

■ Plaintiffs argue that this analysis is not sufficient, or, perhaps, that it is not an analysis at all. Notably absent is any discussion of other private projects that are reasonably likely to move forward in panther habitat. When considered in isolation, most individual projects would impact only small portions of potential panther habitat (and would therefore register a low "disturbance intensity"). However, when multiplied by many projects over a long time period of time, the cumulative impact on the panther might be significant, and might rise to the level of jeopardy. Plaintiffs rely upon *Pacific Coast Federation of Fishermen's Association, Inc. v. National Marine Fisheries Service,* 265 F.3d 1028 (9th Cir.2001), to support the proposition that FWS cannot disregard the risk that, over time, approval of similar projects might degrade panther habitat. *Pacific Coast* concerned a jeopardy analysis conducted by the National Marine Fisheries Service (NMFS) (the marine equivalent of the FWS) during their review of protocols for timber harvests on private lands. NMFS approved harvesting protocols that would allow individual timber sales to go forward unless there was evidence that harvesting a particular site would cause habitat degradation on a watershed scale. (Relative to the size of an individual timber harvest site, a watershed is a very large area of land.) The *Pacific Coast* plaintiffs complained that measuring the impact of individual harvests on such a large scale made it literally impossible for the protections of the ESA to be triggered. The Ninth Circuit held:

> [*The agency's*] *disregard of projects with a relatively small area of impact but that carried a high risk of degradation when multiplied by many projects and continued over a long time period is the major flaw in NMFS study.* Without aggregation, the large spatial scale appears to be calculated to ignore the effects of individual sites and projects. If the effects of individual projects are diluted to insignificance and not aggregated, then [plaintiff] is correct in asserting that NMFS's assessment ... is tantamount to assuming that no project will ever lead to jeopardy of a listed species.

*Id.* at 1036 (emphasis added).

Defendants attempt to distinguish *Pacific Coast* on the grounds that, for the Florida Rock project, FWS has analyzed both the large-scale and the localized impact of the mine on the panther. Defendants also suggest that I should disregard *Pacific Coast* and *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988), another case relied upon by plaintiffs, because those cases can be distinguished on their facts. In both *Pacific Coast* and *Conner,* federal agencies were approving large scale plans that would trigger activities on multiple sites—a harvesting protocol in *Pacific Coast* and the sale of an oil and gas lease affecting large areas of two national forests in *Conner.* In this case, however, the action being approved by FWS and Corps is a single permit for a mine on a single site. Defendants appear to imply that a more thorough cumulative impact analysis would only be appropriate in this case if the FWS

and the Corps were approving a "mining protocol" that would set up the way in which other mines were approved.

But I find the underlying concept expressed in *Pacific Coast* both persuasive and directly applicable to this case. FWS may not disregard reasonably foreseeable projects "with a relatively small area of impact but that carr[y] a high risk of degradation when multiplied by many projects and continued over a long time period." *Pacific Coast,* 265 F.3d at 1036. Defendants argue that there are no private development projects that are "reasonably certain" to occur and that plaintiffs have failed to point out a single piece of evidence to the contrary, but that is an inadequate response where FWS itself recognizes that habitat destruction is one of the most serious threats facing the panther, *see generally* HPP; 1999 Recovery Plan, and where, during the period leading up to the issuance of the BiOp for the Florida Rock project, the Corps was engaged in a large-scale cumulative effects analysis. The FWS indeed reviewed the SFWEIS,[8] *see* SFWEIS, AR Vol. 3, Doc. 146, but, in stark contrast to the SWFEIS, the BiOp contains almost no discussion of the prospect of future development. If the requirement to evaluate cumulative effects is to mean anything, the FWS must not only explain what its "disturbance intensity" numbers mean for panther habitat now, but what part the Florida Rock project will play in the reasonably expectable degradation over time of the habitat upon which

"one of the most endangered large mammals in the world" depends. MSRP, at 4–177.

### iii. *"Best available science."*

Plaintiffs place a great deal of emphasis on the FWS's treatment in the BiOp of the Habitat Protection Plan (HPP), AR Vol. 3, Tab 2. As mentioned above, the HPP was the product of a working group comprised of representatives from many state and federal agencies, including the FWS. *HPP,* at I. It is not disputed that the HPP designates an area encompassing the entire mine site as "Priority 2" land, nor is it disputed that the HPP states that both Priority 1 and Priority 2 lands are "essential in maintaining a self-sustaining population of panthers in south Florida and warrant preservation." *Id.* at 33.

At first, plaintiffs appeared to complain that the HPP's designation of these lands as "essential" was tantamount to a determination that the lands are inviolate for purposes of the ESA. This was, and is, an unsupportable proposition. *See Fund For Animals v. Rice,* 85 F.3d 535, 547 (11th Cir.1996) ("There would be absolutely no point to the consultation and preparation of a [BiOp] if the FWS's opinion were predetermined based on whether proposed project lands fell within the borders of properties discussed in one of any number of recovery plan documents."). The HPP was never intended to be a regulatory tool. Rather, it was developed to aid in planning for the recovery of the species.[9] FWS

---

8. The exact timing and scope of that review is not entirely clear, but it is worth noting that the federal defendants rely upon the fact that FWS reviewed the SFWEIS to support their argument that the Corps satisfied its obligations under ESA section 7(a)(1). *See infra,* at 38 n. 15.

9. FWS is required to develop recovery plans for every endangered and threatened species. 16 U.S.C. § 1533(f). The FWS first developed

a recovery plan for the panther in the early 1980s, Florida Panther Recovery Plan, AR Vol. 2, Tab 57, and updated the plan in the late 1990s, AR Vol. 2, Tab 59. The goal of the plan is to eventually establish three self-sustaining populations of panthers, with the first priority being managing the only surviving population. *Id.* at 13. The plan outlined tasks to aid the panther's recovery, including getting private landowners involved in the

characterizes the HPP as a management tool designed to help identify: (1) habitat for possible acquisition; (2) methods of working with private landowner to encourage protection of habitat; and (3) regulatory options for maximizing protection of panther habitat. Gov't Mot., at 7.

■ Plaintiffs refined their position at oral argument, in any event, characterizing the HPP as a "scientific document" designed to capture the best available science. From that proposition, plaintiffs argue that the FWS's rejection of the "essential" label assigned to these lands in the HPP is a rejection of the "best available science," and insist that the FWS must, at the very least, explain this about-face in the BiOp. Defendants respond that, although the BiOp does not explicitly address the fact that the mine site lies within an HPP Priority 2 area, it does adequately explain why this particular parcel is not really worthy of priority. For example, the BiOp makes it clear that the mine site is located near developed areas of Ft. Myers, is surrounded by a mix of native habitats and agricultural lands, and is very close to the airport. State roads run next to the site and residential lots are located on the opposite side of the road. Moreover, there are many exotic plants growing on the parcel, some of which Florida Rock has agreed to remove and replant as part of their development of the mine site.

Considering the fact that development of the Florida Rock mine represents approximately 25 percent of the federally-permitted development within panther habitat in the 18–year span from 1984 to 2002, see BiOp, at 32, it is surprising that the BiOp does not explain why Priority 2 land is not really "essential" to panther survival, or

discuss whether the Florida Rock site actually functions as a buffer in its current state, or discuss the impact the mining operation would have on this buffer function. I cannot find that these omissions amount to an ESA or APA violation, but one would hope that, upon remand, FWS would provide a better explanation of how its conclusion squares with the HPP and, for that matter, with the Multi–Species Recovery Plan (MSRP), AR Vol. 2, Tab 61, and with the "Closing the Gaps" study, which identified "strategic habitat conservation areas" important to panther survival. See AR Vol. 2, Tab 4.

**b. The Environmental Assessment and Statement of Findings is invalid and must be remanded to the Corps because it relies upon an invalid Biological Opinion and does not comply with the National Environmental Policy Act.**

On February 6, 2003, the Corps issued a "Memorandum for Record" that constitutes both an Environmental Assessment and a Statement of Findings (EA/SOF) concerning Florida Rocks' Clean Water Act section 404(b) permit application. Plaintiffs allege that this document does not satisfy the Corps' obligations under the Endangered Species Act, the National Environmental Policy Act, and the Clean Water Act.

*i. Endangered Species Act claims against the Corps.*

The Corps may not issue a permit to Florida Rock if the mining operation will violate the ESA. 16 U.S.C. § 1536(a)(2). In this case, the Corps relied in large part on the BiOp to determine whether the

---

recovery of the panther. It also called for the development of the Florida Panther Interagency Committee, which eventually led to

the issuance of a Habitat Management Plan in 1993 (the HPP). AR Vol. 2, Tab 57, at 17.

project complied with the ESA. The operative effect of my decision to invalidate the BiOp is to invalidate or at least require suspension of the Corps' permit decision.[10] I do not here decide whether the Corps violated the no jeopardy provision of the ESA or acted arbitrarily or capriciously with respect to the endangered species analysis. I simply remand the determination to the corps for further consideration after renewed consultation with the FWS.[11]

ii. *National Environmental Policy Act claims against the Corps.*

■■■ The National Environmental Policy Act (NEPA) requires every federal agency proposing a "major federal action significantly affecting the quality of the human environment" to prepare an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(c). In evaluating whether an action is "significant," the agency must consider a number of factors, including:

(1) whether the action is related to other actions with individually insignificant but cumulatively significant impacts;

(2) The degree to which the action may adversely affect an endangered species;

(3) The unique characteristics of the area; and

(4) The degree to which the effects are likely to be highly controversial.

40 C.F.R. § 1508.27. The presence of one such factor may be sufficient to deem the action significant, *see Friends of the Earth v. United States Army Corps of Eng'rs,*

109 F.Supp.2d 30, 43 (D.D.C.2000). The action may be significant if "any significant environmental impact *might result* from the proposed agency action." *Grand Canyon Trust v. FAA,* 290 F.3d 339, 340 (D.C.Cir.2002). Federal agencies have discretion to decide whether a proposed action is significant enough to warrant preparation of an EIS, but, in reviewing the exercise of that discretion, a court owes no deference to an agency's interpretation of NEPA or its implementing regulations. *Id.* at 341–42.

If an action is not obviously significant, the agency may begin the process by preparing an Environmental Assessment (EA), which is a "concise public document" which shall "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and shall include "brief discussions of the need for the proposal, . . . the environmental impacts of the proposed action and alternatives. . . ." 40 C.F.R. § 1508.9. The EA constitutes the agency's decision on whether to prepare an EIS or issue a Finding of No Significant Impact (FONSI). *See* 40 C.F.R. § 1501.4. A FONSI is the agency's determination that an EIS is not necessary.

■■■ In this circuit, a court reviews an agency's FONSI finding to determine whether:

First, the agency [has] accurately *identified the relevant environmental concern.* Second, once the agency has identified the problem it must have *taken a*

---

10. This disposition makes it unnecessary to rule on plaintiffs' argument that the Corps failed to review new information that came to light after the issuance of the BiOp, but before the Corps issued its permit. A revised permit decision by the Corps will have to update the information in the record.

11. In any case, as discussed in the following section, the corps did act arbitrarily and capriciously with respect to the NEPA analysis. On this ground alone, I may invalidate the EA/SOF, revoke the permit, and remand to the agency.

"*hard look*" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a *convincing case for its finding*. Last, if the agency does find an impact of true significance, preparation of an EIS can only be avoided if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Grand Canyon Trust*, 290 F.3d at 340–41.

■ Plaintiffs do not dispute that the Corps accurately identified the relevant environmental concerns. Because the Corps relied upon an invalid BiOp, however, I cannot find that it has made a "convincing case" for its finding of no significant impact. For that reason alone, the NEPA analysis will be remanded for further consideration.[12]

The remainder of this section deals with a number of additional arguments plaintiffs have made. None of these points is essential to the remand decision, but discussion of them now will perhaps serve to eliminate or narrow future disputes between these parties.

*(1) The Corps did not articulate a satisfactory explanation as to why a FONSI was appropriate in light of the Corps' own cumulative impact analysis.*

■ An action insignificant in itself may be significant for NEPA purposes if it is "related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). NEPA regulations define cumulative impact as:

[T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* at § 1508.7. The agency must take a hard look at cumulative impacts, "examine[ ] the relevant data and articulate[ ] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sierra Club v. Army Corps of Eng'rs*, 295 F.3d 1209 (11th Cir.2002).

Plaintiffs assert that it is reasonable to anticipate that the Florida Rock mine would have "a cumulatively significant impact on the environment" and that the Corps has not articulated a satisfactory explanation for its contrary conclusion. The Corps responds by pointing out that a thorough cumulative impact analysis was included in the broad SWFEIS. The Corps is indeed permitted to rely on a previous EIS that has addressed similar issues. *Sierra Club v. Army Corps*, 295 F.3d at 1221–22; *Ctr. for Biological Diversity v. Fed'l Highway Admin.*, 290 F.Supp.2d 1175 (S.D.Cal.2003). It does appears that the SWFEIS comprehensively analyzed a wide range of development scenarios for the SW Florida area and that the Corps considered how these development scenarios would impact the panther. *See generally* SFWEIS, AR Vol. 3, Tab 146. To the extent that future development could be anticipated, it also appears that the SWFEIS adequately analyzed the cumulative effects of such development.

It has been noted by our Court of Appeals, however, that the point of the cu-

12. I do not, as the plaintiffs request, remand to the agency with specific instructions that they *must* prepare an EIS. Whether or not an EIS is necessary is a decision the Corps must make based on the updated record before it.

mulative impact analysis in an EA is to provide "sufficient [information] to alert interested members of the public to any arguable cumulative impacts involving [ ] other projects," *Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 71 (D.C.Cir.1987), and it is here that the EA/SOF falls short. The EA/SOF explains that the Florida Rock site is located within the area covered by the SWFEIS, but then, as the following excerpt demonstrates, it becomes very hard to understand just how the Corps applied the SWFEIS' cumulative impact analysis to this project:

> The SWFEIS presents five alternatives for the future, each including a map that delineate [sic] areas of "development", "agriculture", and "preserves" based on various ideas presented to the Corps of Engineers how the land in the study area may be or should be distributed at the end of 20+ years. These maps are used to prepare estimates of acres of wetland fill, area of habitat lost, change in water quality, etc. The SWFEIS recognizes that these maps represent the potential result of many individual decisions by the Corps of Engineers, landowners, Counties, and others.

> The five alternative maps are identified as ensemble Q, R, S, T, U. Ensemble R represents the status quo or existing comprehensive land plan. Ensemble Q provide a larger acreage of development than the comprehensive plan ®. Ensemble S provides greater emphasis on listed species and their habitat. Ensemble T seeks to increase the area of preserves. Ensemble U proposes the largest areas of preserve. The project site is located in an area designated as development on all five alternative maps. The site in it [sic] preproject condition is consistent with Ensemble T, that is the land has an identified usage of agriculture with minimal preserved areas.

With project implementation, changing the site to mining there is complete consistency with Ensemble Q and partial consistency with Ensemble U; as Ensemble U delineates the site for mining and as preserve. The project plan, for the mining of limerock is inconsistent with Ensembles S and R, however Ensemble R delineates the site remaining in agriculture, which is not much different than it shifting to a mining site. Ensemble S delineates the site for preservation; and while during the operation phase that is inconsistent with the Ensemble S, the applicant had offered significant conservation measures to move the post mining site very close [sic] the preservation standard of Ensemble S, in fact the applicant's proposed efforts and conservation allow for improvement of the habitat on site and may very well improve the site as habitat for three endangered species, and this would not be the case if the site was to remain as and agricultural operation. Essentially, as the project transitions from agricultural use to mining use, to post Mining use, it shifts from inconsistent with some Ensembles ® and S to much more consistent, and shifts from being consistent and partially consistent with Ensembles T, Q, and U, to inconsistent with them after it is no longer usable for mining. In general, for the long term, after the operational phase of the mine, there will be an overall environmental improvement as a result of the project. The cumulative effects should be positive at the end of mining and the implementation of all conservation and mitigation measures.

EA/SOF, at 25. If the Corps' analysis really suggests that the Florida Rock project will have the effect of increasing panther habitat over the 35–year projected duration of mining operations, the Corps

needs to explain that conclusion in plain English. Moreover, the Corps must explain how the panther will fare as a species during the intervening 35 years. *See Pacific Coast,* 265 F.3d at 1037 (agency acted arbitrarily/ capriciously when it only evaluated long-term effects of an action, thereby failing to consider impacts that would manifest over a shorter period of time).

*(2) The Corps did adequately address the uniqueness of natural resources that would be lost if the mine is allowed to operate.*

In determining whether an action is "significant" for purposes of NEPA, the Corps must consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27. Plaintiffs assert that the natural resources impacted by the Florida Rock mine are unique enough to render the action significant. Plaintiffs point to the Corps' own SWFEIS, which calls for thorough environmental reviews of development affecting certain unique natural resources. In fact, the SWFEIS indicates the Florida Rock site lies in an area where changes in use may impact important natural resources. SWFEIS Ensemble, AR Vol. 3, Tab 146, App. H. The record also suggests that the mine might impact key historic flow-ways, key habitat connection areas, Florida panther habitat, a strategic habitat conservation area, and a basin with degrading water quality. *See id.;* Letter from Presser (Sept. 13, 2002), AR Vol. 3, Tab. 126.

In the end, however, I am persuaded that there is nothing about this property, vis á vis all other land designated as Priority 2 under the HPP, that should trigger an EIS because of its "uniqueness." The State Historic Preservation Officer determined there were no unique cultural or historical sites on the project site and emphasized that the site is degraded, contains exotic species, and is surrounded by degraded and developed land. The potential value of the land for the panther will be captured for NEPA purposes in the Corps' evaluation of the endangered species impacts of the project. There is no requirement that the Corps perform yet another endangered species review as part of this uniqueness evaluation.

*(3) The Corps did not disregard scientific controversy.*

An action also may be "significant" (and therefore require an EIS) if there is substantial controversy surrounding the project. 40 C.F.R. § 1508.27. Just what constitutes the type of "controversy" that requires a full EIS is not entirely clear. Controversial projects include those in which there is "a substantial dispute [about] the size, nature, or effect of the major federal action." *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 736 (9th Cir.2001) (cited with approval in *Town of Cave Creek v. FAA,* 325 F.3d 320, 331–32 (D.C.Cir.2003)).

The receipt of numerous comments from individuals specifically concerned with the agency's conclusion that a project will not significantly affect an endangered species may identify "precisely the type of controversial action for which an EIS must be prepared." *Sierra Club. v. United States Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir. 1988). For example, in *National Parks,* 241 F.3d at 737, the National Park Service received 450 comments on a plan to manage cruise ship access to Glacier Bay National Park, approximately 85 percent of which opposed one a higher traffic alternative and favored a different alternative. This "outpouring of public protest" was enough of a controversy to trigger the

requirement of an EIS, especially because the dispute went "beyond a disagreement of qualified experts over the reasoned conclusions as to what the data reveal." *Id.* The comments "urged that the EA's analysis was incomplete, and the mitigation uncertain, [and] cast substantial doubt on the adequacy of the Park[ ] Service's methodology and data." *Id.* In *Friends of the Earth*, 109 F.Supp.2d at 43, the Corps received numerous comments critical of the EA and its conclusion that the opening of a massive casino project would not significantly affect the environment. In addition, the three other federal agencies and one state agency continued to dispute the Corps' evaluation of the impacts of the casino. *Id.*

The record in this case does contain letters from concerned individuals about the opening of the Florida Rock mine, but only a handful of them actually challenge the conclusion that the Florida Rock project will not jeopardize the panther. More importantly, this case does not involve the inter-agency disagreement that appeared in *Friends of the Earth.* Nor does it appear that the Corps was ignoring scientific controversy about the Florida Rock project at the time it issued the EA/SOF. Plaintiffs filed comments that pointed to large-scale studies (not specific to the Florida Rock project) and papers pertaining generally to conservation of the panther that arguably called into question the adequacy of the EA/SOF. But the existence of diverse thought in the scientific literature does not necessarily equate to scientific controversy. Such a controversy exists where the Corps is presented with scientific evidence specifically evaluating the environmental effects of the proposed project or calling into question the adequacy of the EA. *See Cold Mountain v. Garber*, 375 F.3d 884, 893 n. 7 (9th Cir.2004); *cf. Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir.1998); *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1192–93 (9th Cir. 1988). No such evidence was before the Corps when it issued the EA/SOF. The record before the Corps at the time of its decision does not indicate substantial scientific controversy. On remand, of course, the record before the Corps may require a different conclusion.

### iii. *Clean Water Act claims against the Corps.*

The CWA prohibits the discharge of any pollutant, including dredged or fill material, into the navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a). The Corps is the agency responsible for issuing dredge and fill permits (404(b) permits) when an applicant wishes to fill any wetland, as Florida Rock wishes to do in this case. These regulations prohibit the issuance of a permit (1) if ESA violations occur; (2) practicable alternatives exist, (3) a discharge contributes to significant degradation of the aquatic environment, or (4) adverse impacts are not minimized. 40 C.F.R. § 230.10. The Corps may only issue a 404(b) permit if there is sufficient information to "make a reasonable judgment as to whether the proposed discharge will comply with [the 404(b) ] Guidelines." Section 404(b) Guidelines, at § 230.5(g).

#### (1) *ESA violations.*

The Corps may not issue a 404(b) permit if to do so it will jeopardize the continued existence of an endangered species. 40 C.F.R. § 230.10(b)(3). I again decline to rule on the question of whether the Corps has violated this no jeopardy provision incorporated into the CWA or whether the Corps for this reason acted arbitrarily or capriciously in issuing the EA/SOF. As mentioned above, because the Corps relied on a BiOp that must be remanded to the

FWS, it is also appropriate to revoke the permit. Again, however, I will also address plaintiffs' alternative challenges to the permit decision under the CWA.

*(2) The Corps completed an adequate alternatives analysis.*

The Corps has a duty to evaluate whether practicable alternatives exist to a project that will result in the filling of a jurisdictional wetland.[13] In its alternatives analysis for this project, the Corps explained that many other parcels which might suit Florida Rock's purpose either have insufficient valuable limerock deposits, support large percentages of wetlands, have greater endangered species concerns, have previously been permitted for residential development, or are being mined by other mining companies. EA, at 9. Plaintiffs respond that it is not enough that "many" other parcels may not be practicable if "some" other parcels would be. Plaintiffs even suggest that perhaps Florida Rock could transport the stone from elsewhere, reasoning that, although the cost might be higher, they should be forced to analyze that option. But the Corps has a duty to take into account the *applicant's* objectives for the project. *La.*

*Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985). Here, Florida Rock's stated purpose was to provide a source of limestone for its existing mining operations in Lee County. Gov't Mot., at 42. *See Stewart v. Potts,* 996 F.Supp. 668, 675–76 (S.D.Tex.1998) (it is within the Corps' discretion to consider only alternatives within a particular city if the purpose is specifically to build a facility in that city).

*(3) The Corps reasonably concluded that the issuance of the dredge and fill permit will not contribute to significant degradation of the aquatic environment.*

In performing this part of the analysis, the Corps must determine the "potential short-term or long-term effects of the proposed discharge [ ] on the physical, chemical, and biological components of the aquatic environment...." 40 C.F.R. § 230.11. This must include an analysis of the cumulative and secondary effects on the aquatic ecosystem. *Id.* Plaintiffs central argument is that the Corps did not adequately analyze the secondary impacts that would result from the mine's production of fill material for use in other development projects.[14] But, the Corps ac-

---

**13.** Where activities are not water dependent (it is undisputed that this mining activity is not inherently water dependent) the regulations create a rebuttable presumption that there are, in fact, practicable and environmentally preferable alternatives to discharging dredged and fill material into wetlands. 40 C.F.R. § 230.10(a)(3). Practicable alternatives that do not involve discharges into wetlands are presumed to have less adverse impact unless "clearly demonstrated" otherwise. *Id.; Utahns For Better Trans. v. United States Dept. of Transp.,* 305 F.3d 1152, 1163 (10th Cir.2002).

**14.** It appears that plaintiffs' initially framed this argument around a single sentence (albeit a long one) in the EA/SOF. "The project will provide a source for sand and shell fill

material that can be use [sic] for fill in future regional subdivisions, shopping malls, and roadways, [sic] mine will be able to provide materials for the production of cement, and aggregate for the production of concrete, all of which can play a rule [sic] in the overall development of Southwest Florida [sic] however it is not a direct relationship (ie [sic] without the mine Southwest Florida will not develop)." EA/SOF, at 13. Plaintiffs appear to have read the parenthetical at the end of this sentence out of context and to have proceeded on the assumption that the Corps found a direct relationship between the mine and development in southwest Florida. Had this been the case, plaintiffs' argument that the Corps failed to adequately analyze secondary impacts would have been more persuasive. However, when read in context, it is clear

knowledged that the project effects would not be limited to on-site environmental consequences. The agency explained that the project would provide a source for fill material that would be used in other construction projects, but the Corps reasoned that there would be no direct correlation between the operation of the mine and the development of Florida. I find the Corps' discussion adequate.

*(4) The Corps adequately minimized impacts to wetlands.*

Finally, plaintiffs argue that the Corps has failed to live up to its obligation to minimize those impacts that cannot be avoided. 40 C.F.R. § 230.10(d). Plaintiffs maintain that the Corps failed to require Florida Rock to minimize in this fashion. But the record reveals that the Corps took extensive steps to ensure the minimization of impacts to wetlands. For example, in the context of the alternatives analysis, those sites containing wetland and poor quality limestone were eliminated, and those areas with wetlands and high quality rock were examined with an eye toward eliminating mining from high quality wetlands. Moreover, the Corps required extensive compensatory mitigation, so that only 333 acres of the 2500 acres of jurisdictional wetlands were impacted.

**c. The Corps has satisfied its obligations under section 7(a)(1) of the Endangered Species Act to create a program to conserve the panther.**

Plaintiffs also allege that the Corps stands in violation of section 7(a)(1) of the ESA, which provides that:

All [ ] federal agencies [other than the FWS] shall, in consultation with and with the assistance of the [FWS], utilize their authorities in furtherance of the

that the Corps did not see such a direct con-

purposes of this Chapter by *carrying out programs* for the conservation of endangered species . . . .

16 U.S.C. 1536(a)(1). Plaintiffs argue that the Corps has simply failed to develop any program to conserve the Florida panther. The Corps insists that it satisfied its obligations under section 7(a)(1) with the issuance of the SWFEIS, which includes a review of the habitat used by the panther and draft review criteria that the corps will use in assessing permit applications within panther habitat. Plaintiffs respond that the SWFEIS is not a program designed to conserve the panther but that it simply reiterates the Corps' ESA responsibilities in general terms.

The Corps has discretion in the design of such programs, *Pyramid Lake Paiute Tribe v. United States Dept. of the Navy,* 898 F.2d 1410, 1418 (9th Cir.1990). This discretion is not so broad as to excuse total inaction, *see Sierra Club v. Glickman,* 156 F.3d 606 (5th Cir.1998), but there is very little caselaw interpreting section 7(a)(1) and none that would shed light whether the Corps' SWFEIS is an adequate section 7(a)(1) program. *Cf. Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

██ After a close examination of the SWFEIS, I cannot find that the Corps has failed to satisfy its burden under section 7(a)(1). In the body of the SWFEIS, the Corps reviews the key documents pertaining to panther conservation: (1) the FWS's Multi–Species Recovery Plan, which recommends habitat-level conservation activities; (2) the "Closing the Gaps" study, which ranks lands in terms of conservation priority; and (3) the Florida Panther Habitat Preservation Plan (HPP), which maps lands "considered essential to maintaining

nection.

the Florida panther south of the Caloosahatchee River at its present level." SFWEIS, at 97–98. The SWFEIS also reviews the habitat preferences of the panther and the management activities currently underway to preserve preferred habitat. *Id.* 98–100.

Critically, the SWFEIS also sets forth draft "Review Criteria" for the Corps to use during the permit approval process. The relevant section of the SWFEIS summarizes the panther's habitat needs and then establishes draft criteria that will trigger further scrutiny. If certain factors are present, the Corps should emphasize avoidance of that area or, if avoidance is not possible, the Corps should encourage restoration of equivalent habitat elsewhere in the panther's range. *Id.* at App. H. Given the broad discretion afforded the Corps under section 7(a)(1), I conclude that the Corps' review criteria satisfies its obligation to "utilize [its] authorities in furtherance of the purposes of [the Act] by *carrying out programs* for the conservation of endangered species and threatened species...." 16 U.S.C. 1536(a)(1).[15]

An appropriate order accompanies this memorandum.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, it is

**ORDERED** that the motions of defendants and defendant-intervenor for summary judgment [23] and [24] are **DENIED**, except with respect to the United States Army Corps of Engineers' (Corps) compliance with Section 7(a)(1) of the Endangered Species Act (ESA), as to which defendants' motion [23] is **GRANTED**. It is

**FURTHER ORDERED** that plaintiff's motion for summary judgment [18/20] is **GRANTED**, except with respect to the following: (a) the Corps' compliance with Section 7(a)(1) of the ESA, as to which plaintiffs' motion [18/20] is **DENIED**; (b) the Corps' compliance with Section 7(a)(2) of the ESA, the Administrative Procedure Act (APA), and the Clean Water Act (CWA) in issuing the Environmental Assessment and Statement of Findings (EA/SOF) for the Fort Myers Mine #2, as to which plaintiffs' motion [18/20] is **DENIED AS MOOT**; and (c) certain specific forms of relief requested by plaintiffs. It is

**FURTHER ORDERED** that the Biological Opinion (BiOp) for the Fort Myers Mine #2 is declared invalid in violation of the Administrative Procedure Act and remanded to the United States Fish and Wildlife Service for reconsideration. It is

**FURTHER ORDERED** that the EA/SOF for the Fort Myers Mine #2 is declared invalid in violation the National Environmental Policy Act and remanded to the Corps for reconsideration. And it is

**FURTHER ORDERED** that the 404(b) permit issued to Florida Rock Industries by the Corps for the Fort Myers Mine #2 is declared invalid.

---

**15.** Plaintiffs argue in the alternative that the Corps did not consult with FWS in preparing the SFWEIS, as required by section 7(a)(1). But the FWS did review the document.

SFWEIS § 5, at 161. Plaintiffs do not point to any authority to support the proposition that such a review is inadequate under 7(a)(1).