SIERRA CLUB, Natural Resources Defense Council, and National Parks Conservation Association, Plaintiffs,

v.

Lt. Gen. Robert L. VAN ANTWERP, Chief of Engineers, United States Army Corps of Engineers, and H. Dale Hall, Director, United States Fish and Wildlife Service, Defendants,

Miami–Dade Limestone Products Association, Inc., Vecellio & Grogan, Inc., Tarmac America LLC, Florida Rock Industries, Inc., Sawgrass Rock Quarry, Inc., Apac–Florida, Inc., Rinker Materials of Florida, Inc., Kendall Properties and Investments, Defendants–Intervenors.

Case No. 03–23427–CIV–HOEVELER.

United States District Court,
S.D. Florida.

Jan. 30, 2009.

Bradford H. Sewell, Lawrence M. Levine, S. Ansley Samson, Natural Resources Defense Council Inc., Stanley N. Alpert, Alpert Firm, New York, NY, Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, DC, Paul Joseph Schwiep, Coffey Burlington, Charles H. Baumberger, Rossman Baumberger Reboso & Spier, Miami, FL, for Plaintiffs.

Mark A. Brown, Michael Semler, Norman L. Rave, Jr., Barry Alan Weiner, United States Department of Justice, Environment and Natural Resources, Washington, DC, for Defendants.

Douglas Martin Halsey, Thomas Neal McAliley, White & Case, Miami, FL, Lawrence R. Liebesman, Rafe Petersen, Holland & Knight, Washington, DC, Martin John Alexander, Holland & Knight, West Palm Beach, FL, John A. Devault, III, Bedell Dittmar Devault Pillans & Coxe, Jacksonville, FL, for Defendants–Intervenors.

### ORDER PURSUANT TO REMAND

WILLIAM M. HOEVELER, Senior District Judge.

THIS CAUSE comes before the Court to determine whether the United States Army Corps of Engineers complied with the Clean Water Act, 33 U.S.C. § 1251(CWA), National Environmental Policy Act, 42 U.S.C. § 4321 (NEPA), and the Administrative Procedure Act, 5 U.S.C. § 706(APA), when it issued permits in 2002 to several limestone mining corporations for the discharge of dredged or fill material into wetlands in Miami–Dade

County, pursuant to 33 U.S.C. § 1344 (§ 404 of the CWA).

In granting summary judgment for the Plaintiffs in 2006, the Court concluded that the Corps did not comply with its statutory and regulatory obligations. *Sierra Club v. Flowers,* 423 F.Supp.2d 1273 (S.D.Fla. 2006). After hearing argument from all sides regarding the appropriate remedy, the Court then issued a second order vacating the permits. *Sierra Club v. Strock,* 495 F.Supp.2d 1188 (S.D.Fla.2007). On appeal by the Intervenors, the Eleventh Circuit vacated, in part, the Court's summary judgment order,[1] and vacated the additional order setting aside the permits. *Sierra Club v. Van Antwerp,* 526 F.3d 1353 (11th Cir.2008). The Court of Appeals remanded the case with instructions that, in resolving the summary judgment motions, the Court must apply the proper degree of deference to the Corps' permitting decision. Having freshly reviewed the administrative record and heard additional argument from the parties, the motions are now ripe for resolution as directed by the Court of Appeals. For the reasons explained below, the Plaintiffs' motion is GRANTED and the cross motions for summary judgment are DENIED.

## BACKGROUND

The facts of this dispute have been addressed in detail on previous occasions. Briefly, this case is about a group of limestone mining corporations seeking permits under § 404 of the CWA to excavate limestone in a 54,000 acre area at the northwestern edge of Miami–Dade County and in areas near Everglades National Park. The area is primarily wetlands overlying the Biscayne Aquifer, the main source of drinking water for Miami–Dade County.

The Corps issued the permits in April 2002, *see* Record of Decision (ROD), found at Administrative Record 1028 (AR1028), for a period of ten years, authorizing approximately 5,400 acres of wetlands to be converted to mining pits. The Corps' approval relied on an Environmental Impact Statement (EIS), AR614, issued two years earlier, which addressed the miners' original proposal for fifty years of mining and a total of 14,300 acres of destroyed wetlands, AR65. That EIS was criticized by a number of agencies, organizations, and individuals, and, as a result, the Corps reduced the initial term of these permits to ten years, with the stated intention of issuing additional permits in the future.[2] The Corps was asked by several agencies to further study the issue, i.e., prepare a Supplemental EIS (SEIS), prior to approval of the permits and again after the permits were issued, but the Corps elected to rely on the original EIS.

After the Court entered summary judgment for Plaintiffs in March 2006, the parties were granted an evidentiary hearing regarding what should occur while the Corps was preparing an SEIS and considering whether to reauthorize the permits, withdraw the permits, or take some other action. During that phase of the case, the

---

1. The Court of Appeals did not disturb this Court's entry of summary judgment for Plaintiffs relating to violations of the Endangered Species Act, 16 U.S.C. § 1531, and the APA. Defendants had been ordered, at a minimum, to engage in formal consultation regarding the impact on protected species, which they have done.

2. The Corps explains in the ROD that the decision on these ten year permits, which will not be mined out for 14 years, AR1028 at 67, is "made with full understanding and disclosure of their relationship to the larger plan," AR1028 at 96. In discussing mitigation, the Corps indicated anticipated approval of the fifty year mining plan: "since the mining impacts are spread over 50 years, there is opportunity to adjust the permit (either in the work authorized or in the compensatory mitigation plan) as appropriate." AR1028 at 73.

Court received evidence (not contained in the administrative record) of the presence of benzene in the Biscayne Aquifer. The benzene was detected in water pumped from an area known as the Northwest Wellfield, located within the area of the mining authorized in these permits. This contamination resulted in several municipal wells in the Wellfield being shut down, an investigation by Miami–Dade County into the source, and criticism directed toward the miners for using chemically hazardous blasting compounds near the County's wells. After weighing the evidence, I entered a supplemental order in July 2007 which imposed the traditional APA remedy of vacating the agency action; I also concluded that the limestone mining had contributed to the benzene contamination. In response to the Intervenors' claims of substantial economic hardship in the event of a cessation of all mining under these permits, I stayed the effect of the ruling as to mining in locations other than those nearest to the wells. The Corps subsequently issued a draft SEIS[3] and a "Second Three-year" review for the permits.

## ANALYSIS

The CWA claims before the Court relate to whether the Corps was arbitrary or capricious in determining that no practicable alternatives existed. The NEPA claims are whether the EIS met NEPA's requirements and whether the Corps' determination that the ten year permits would have no significant effect (beyond the effects studied in the original EIS) was arbitrary, capricious, or an abuse of discretion.

### Standard of review

A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law." 5 U.S.C. § 706(2)(A).[4] The pertinent APA standard of review is "exceedingly deferential," *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir.1996), and a court must not "substitute its judgment for that of the agency," *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996). However, the "failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," and "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Simmons v. Block*, 782 F.2d 1545, 1549–1550 (11th Cir. 1986) (citations omitted) (affirming decision to set aside agency action as arbitrary and capricious where agency "followed neither course of action specified in the regulations"). Similarly, the Eleventh Circuit has held that it is unacceptable for an agency to "[i]nterpret[ ] a regulation in a manner that robs it of all meaning." *Sier-*

---

**3.** Although this Court's decision as to the SEIS has been vacated, the Corps has reported that they are, nevertheless, continuing to finalize the draft SEIS prepared in response to this Court's order. The Corps is studying not only the issues raised by the permits which caused this litigation, but also new permit requests for additional mining "in varying degrees over the next 5 to 30 years." *See* Draft SEIS, Dkt. No. 452. In light of the Corps' activities, Plaintiffs' original request for an SEIS is moot.

**4.** The APA standard of review, specifically the "arbitrary or capricious" test, applies to each of the environmental statutes at issue herein. *See, e.g., Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1249 (11th Cir.1996) (applying "arbitrary and capricious" standard to CWA claim); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (rejecting "reasonableness" standard of review in favor of APA's "arbitrary and capricious" standard as to NEPA claims).

ra Club v. Martin, 168 F.3d 1, 5–7(11th Cir.1999) (agency decision entitled to no deference when decision was "contrary to the clear language of [agency's forest plans] and the [National Forest Management Act]").

### Statutory and regulatory guidance

In issuing 404(b) permits the Corps' decisionmaking authority is governed substantively by the CWA and procedurally by both the CWA and NEPA. The primary focus of the analysis that follows is the CWA, although I have annotated that analysis with selected provisions of NEPA.

The CWA imposes requirements on the Corps when deciding whether to issue permits for the discharge of dredged or fill material into wetlands.[5] The CWA also requires that the Corps follow guidelines developed by the Environmental Protection Agency (EPA), 40 C.F.R. Part 230 (the Section 404(b)(1) Guidelines), and regulations adopted by the Corps, 33 C.F.R. Parts 320–329, when issuing such permits.

The 404(b)(1) Guidelines prohibit the Corps from issuing a 404(b) "dredge or fill" permit if the proposed project can be developed without disturbing wetlands, that is, if an environmentally preferable and practicable alternative exists. 40 C.F.R. 230.10(a). In addition to the 404(b)(1) Guidelines, the Corps' own CWA regulations also specifically require the Corps to consider practicable alternative locations and methods for accomplishing the project's objective, see 33 C.F.R. 320.4(a)(2)(ii). A practicable alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. 230.10(a)(2).

The Corps also must follow the procedures imposed by NEPA. NEPA's purpose is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. The statute contains procedural directives to "insure that [high quality] environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA," id., and "Federal agencies must comply with both the letter and spirit of the statute," 40 C.F.R. 1500.1(a). The statute requires the preparation of an EIS, 42 U.S.C. § 4332(2)(c), which is governed by Corps regulations found at 33 C.F.R. 230.1 and Appendix B of 33 C.F.R. Part 325, and regulations promulgated by the Council on Environmental Quality (CEQ) (40 C.F.R. Part 1500). The EIS must study alternatives to the proposed action, 40 C.F.R. 1502.14. The alternatives analysis required by NEPA is similar to the alternatives analysis required by the CWA;[6] both analyses depend upon a proper statement of the project's purpose.

---

5. For example, the CWA requires that the Corps provide notice and an opportunity for public hearings prior to issuing such permits, 33 U.S.C. § 1344(a), (b); however, the regulations provide the Corps with discretion not to hold a hearing if there is "no valid interest to be served by a hearing," 33 C.F.R. 327.4(b). In this case the Corps rejected, as is its discretionary right, several requests for a public hearing, concluding that "substantive additional information would not be received and that a public hearing would not benefit the decision-making process on this permit application." AR1028 at 113–14.

6. "[T]he analysis of alternatives required for NEPA environmental documents ... will in most cases provide the information for the evaluation of alternatives under [the 404(b)(1)] Guidelines." 40 C.F.R. 230.10(a)(4). However, under the CWA, "alternatives outside of the applicant's control may be considered," 40 C.F.R. 230.10(a)(2).

## I. The Clean Water Act

The 404(b)(1) Guidelines include a specific requirement that "practicable alternatives that do not involve [wetlands] are *presumed to be available*" if the activity for which the permit is sought "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent')." 40 C.F.R. 230.10(a)(3) (emphasis added). If the proposed activity is not water dependent, the permit applicant must rebut the presumption of environmentally preferable and practicable alternatives by clearly demonstrating the absence of such alternatives. *Id.*

### A. Project purpose

 The Corps' identification of the project purpose is essential to implementation of the CWA because the statement of the project's "basic purpose" determines whether the presumption of practicable alternatives applies, and thus whether the applicant has the burden of clearly demonstrating that there are no such alternatives. 40 C.F.R. 230.10(a)(3). *See, e.g., Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345 (8th Cir.1994) ("Central to evaluating practicable alternatives is the determination of a project's purpose."). A conclusion that the project's basic purpose "require[s] access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," must be supported by the record. In this case, the

Corps concluded that the project's basic purpose, limestone excavation, is water dependent. Plaintiffs have challenged that conclusion, and this Court must resolve the dispute by examining the record and any relevant authority to determine whether the Corps' decision was arbitrary or capricious.

### B. Is the project's basic purpose water dependent?

 The Corps stated in the ROD that the "basic purpose" of this project was "to extract limestone." AR1028 at 8. This decision is entitled to deference. Having established the project's basic purpose, the Corps then had to decide whether the activity is water dependent. 40 C.F.R. 230.10(a)(3).

The water dependency test prevents the Corps from approving environmentally harmful activities in wetlands if those activities might otherwise be relocated to upland locations. Permit applicants can rebut the presumption that environmentally preferable locations exist by clearly demonstrating that there are no practicable alternatives to the proposed activity. Here, the Corps concluded, without explanation, that "[t]he activity needs to be located in a special aquatic site to fulfill its basic purpose," AR1028 at 59.[7]

Neither the CWA nor its implementing regulations list examples of "water dependent" activities, nor does the definition of a

---

7. In the EIS, the Corps reported that "[b]y nature of the project, it involves work in wetlands, and no practicable alternative to working in wetlands exists." AR614 at 103. In briefs filed in this litigation, the Corps asserted that "the purpose of the requested permits was to allow the applicants to exercise their mining rights." Dkt No. 32, at 33. The Corps argues that "the proposed activity is the extraction of particular mineral resources located in particular wetlands [and it] would be meaningless to state that this activity could be carried out elsewhere ... [t]hus, the Corps

properly did not apply a presumption that practicable alternatives were available." Dkt No. 42, at 16. On the contrary, 40 C.F.R. 230.10(a)(3) would be meaningless if a project could be defined so narrowly as obtaining a *particular* mineral source from a *particular* wetland. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1367 (11th Cir.2008) (Kravitch, J., dissenting) ("A project is not water-dependent simply because an applicant asks to do it on wetlands, but only where it literally cannot be done elsewhere.").

project's purpose as "water dependent" receive much analysis in reported decisions. A statement of the Corps' standard operating procedures, referenced in a recent opinion, provides the following:

> [D]efining the purpose of a project involves two determinations, the basic project purpose, and the overall project purpose.... The basic purpose of the project must be known to determine if a given project is 'water dependent.' For example, the purpose of a residential development is to provide housing for people. Houses do not have to be located in a special aquatic site to fulfill the basic purpose of the project, i.e., providing shelter. Therefore, a residential development is not water dependent.... Examples of water dependent projects include, but are not limited to, dams, marinas, mooring facilities, and docks. The basic purpose of these projects is to provide access to the water.

Army Corps of Engineers Standard Operating Procedures for the Regulatory Program (October 15, 1999), cited in *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F.Supp.2d 1236 (M.D.Fla.2008).[8]

In this case, the Corps first announced in the EIS, without any explanation, that "[b]y nature of the project, it involves work in wetlands, and no practicable alternative to working in wetlands exists," AR614 at 103. The Corps repeated that conclusion in the ROD: "[t]he activity needs to be located in a special aquatic site to fulfill its basic purpose." AR1028 at 59. Absent some explanation by the Corps, however, the Court is unable to defer to the Corps' unsupported conclusion that this limestone mining is water dependent,[9] particularly because the Corps' conclusion as to these permits directly conflicts with the Corps' assessment in another permit issued for substantially similar limestone mining within months of the approval of these permits. In 2003, the Corps concluded that limestone excavation did not need to be located in a special aquatic site to fulfill its basic purpose of "develop[ing] a source for limerock" and approved a permit requested by Florida Rock—also a recipient of one of the permits at issue in this case—to mine limestone in Southwest Florida wetlands.[10] That permit was the subject of the decision in *Nat'l Wildlife Fed'n v. Norton*, 332 F.Supp.2d 170, 186 n. 13 (D.D.C.2004); as noted by that court, it was "undisputed that this mining activity is not inherently water dependent," *id.* If limestone excavation is not inherently water dependent in one situation, then it is not inherently water dependent in another.

---

8. Another source of potential guidance is found in the record. The "Draft ASTM Standard for Good & Customary Practice for Evaluating Practicable Alternatives Under the Clean Water Act Section 404 Program," was promoted by the mining permit applicants as providing "useful insight into the 'practicability' issue." AR583 at 9. That draft standard defines the basic project purpose as "the fundamental, essential purpose for the proposed project" and offers examples such as "the basic purpose of a proposed housing development is to provide shelter and is generally considered to be non-water dependent," and "the basic purpose of a restaurant is to feed people," *citing* Preamble to EPA's section 404 guidelines at 45 Fed. Reg. 85336–39 (Dec. 24, 1980). AR583 at 62.

9. As one court recently observed in the NEPA context, it is impossible to "defer to a void." *Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1142 (9th Cir.2008) (finding violation of NEPA where agency stated that it need not consider wilderness values despite regulatory guidance to the contrary).

10. *See* Plaintiffs' Notice of Filing, Dkt No. 48 at Exhibit 2, Corps' Statement of Findings regarding Florida Rock permit for mining, dated February 6, 2003. The Corps' Public Notice as to that limestone mining permit was issued in March 1998, *id.* at 174, thus, that proposed mining activity was being reviewed at the same time that the Corps was evaluating the permit applications at issue in this case.

The Corps is free, of course, to exercise its discretion and arrive at various conclusions, or change its position,[11] but a reviewing court necessarily examines carefully the Corps' decision to take diametrically opposed positions as to two projects with nearly identical parameters.[12]

The Corps' water dependency conclusion in this case is also at odds with its reported decisions as to what constitutes water dependent activities in other cases. As stated in the Corps' standard operating procedures, noted above, construction of a dam, marina, mooring facility, or dock necessarily involve bodies of water. Reported decisions provide additional examples: *Nat'l Wildlife Fed'n v. Whistler,* 27 F.3d 1341, 1345–46 (8th Cir.1994) (providing boat access to a housing development); *Korteweg v. United States Army Corps of Eng'rs,* 650 F.Supp. 603, 605 (D.Conn. 1986) (boat slips for residential development); *Friends of the Earth v. Hintz,* 800 F.2d 822, 835 (9th Cir.1986) (constructing a sorting yard for logs waiting to be transported by ocean cargo carriers).

On the other hand, the Corps has concluded, and reviewing courts have agreed, that other activities are not water dependent: *Shoreline Assoc. v. Marsh,* 555 F.Supp. 169 (D.Md.1983), *aff'd.* 725 F.2d 677 (4th Cir.1984) (construction of townhouse community); *Great Rivers Habitat Alliance v. United States Army Corps of Eng'rs,* 437 F.Supp.2d 1019, 1028–30 (E.D.Mo.2006) (construction of flood control levee and road improvements for a mixed-use development); *Northwest Bypass Group v. United States Army Corps of Eng'rs,* 552 F.Supp.2d 97, 108–109 (D.N.H.2008) (construction of roadway), and *Hoosier Envt'l. Council v. United States DOT,* 2007 WL 4302642, 2007 U.S. Dist. LEXIS 90840 (S.D.Ind.2007) (highways); *Kentuckians for the Commonwealth v. Rivenburgh,* 206 F.Supp.2d 782, 804 (S.D.W.Va.2002) (surface coal mining); and *Bering Strait Citizens for Responsible Resource Development v. United States Army Corps of Eng'rs,* 524 F.3d 938, 947 (9th Cir.2008) (gold mining). The Court's review of the Corps' conclusions in these cases is illuminating, and provides context in considering the Corps' analysis in this case.

Nothing in the administrative record indicates that the basic purpose of this project, limestone excavation, requires siting within wetlands. Nor do any of the Corps' prior positions suggest that limestone excavation is a water dependent activity.[13] The inconsistency of the Corps' conclusion

---

11. For example, an agency is permitted to change its interpretation of a regulation, but if it does so without explanation, a court might find that change to be "an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). In *Nat'l Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1129 (D.C.Cir.1997), the court noted that because, *inter alia,* there was no evidence that the agency had ever "adopted a different interpretation of the regulation" or that the agency decision was "anything less than the agency's considered opinion," deference to the agency's interpretation was appropriate.

12. In the EIS issued in 1983 as to earlier attempts to obtain mining permits in the same geographic area at issue in the challenged permits, *see* "Excavation and Use of Limestone in South Florida," AR2, the Corps describes the purpose as "limestone mining," AR2 at 11, and there is no mention in the Record of Decision, AR3, that limestone mining is water dependent.

13. The "Draft ASTM Standard for Good & Customary Practice for Evaluating Practicable Alternatives Under the Clean Water Act Section 404 Program," AR583 at 9 (discussed above, at note 8), describes a marina and a water supply facility as water dependent, and notes that in projects with multiple components, "the basic purpose of each component must be evaluated individually … [f]or example, a project may not be considered water dependent merely because its components are

in light of the above referenced sources, particularly with respect to the Corps' conclusion about the limestone mining at issue in *Nat'l Wildlife Fed'n v. Norton*, 332 F.Supp.2d 170, forces the Court to conclude that the Corps' decision that the basic purpose of this project was water dependent was arbitrary and capricious.

### C. Practicable alternatives

 The Corps has a duty to independently evaluate practicable alternatives to the proposed project "if such alternatives would have less adverse impact on the aquatic ecosystem [and no] other significant adverse environmental consequences." 40 C.F.R. 230.10(a). *See also, Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543.[14] The Corps has this duty regardless of whether the regulatory presumption, discussed above, is applied. The Corps "conducts its own independent eval-

uation [of practicable alternatives]," *id.*, and, in doing so, the Corps must "exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective," 33 C.F.R. Part 325, App. B(9)(b)(4).[15] The Corps also must "document in the record the … independent evaluation of the information [submitted by the applicant for the EIS] and its accuracy, as required by [NEPA CEQ regulations] 40 C.F.R. 1506.5(a)." 33 C.F.R. Part 235 App. B(8)(f)(2).[16] For example, courts have criticized the Corps for failing to exercise independent judgment when evaluating the applicant's statement of purpose for the project, *see, e.g., Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir.1997) (Corps' "wholesale acceptance of [the permit applicant's] definition of purpose" did not comply with NEPA).[17]

contiguous to marina facilities." AR583 at 73. "The concepts of 'integration,' 'continuity' and 'waterfront' must not be used to defeat the purpose of the 'water dependency' and 'practicable' alternatives provisions of the Guidelines nor to preclude the existence of practicable alternatives." *Id.*

**14.** The Corps is "obligated to determine the feasibility of the least environmentally damaging alternatives that serve the basic project purpose." *Utahns v. United States DOT*, 305 F.3d 1152, 1189–90 (10th Cir.2002) (agency decision arbitrary and capricious because agency deemed water dependent that portion of project which was irrelevant to basic purpose of meeting future travel demands for a highway corridor).

**15.** The Corps adopted the rule in Appendix B of 33 C.F.R. 325 to "clarify and streamline the Corps NEPA requirements" for activities related to water resource development projects. 53 F.R. 3120 (Feb. 3, 1988). This rule governs the Corps' analysis as to CWA 404(b) issues because "[t]he activity the Corps studies in its NEPA document is the discharge of dredged or fill material." *Id.*

**16.** The CWA's directive that public participation "shall be provided for, encouraged,

and assisted" in enforcing the CWA's standards, 33 U.S.C. § 1251(e), also suggests the importance of disclosing accurate information to the public. As an example of misleading information distributed to the public regarding the extent of the proposed project and its impact on wetlands, there is a significant difference between the final public notice and the ROD in the reported numbers of acres to be mined. For example, the Revised Public Notice issued in March 2001 reports a total of 1,400.58 acres to be mined by Rinker Materials, AR737, but the ROD issued in April 2002 reports that the total in Rinker's first ten years of mining will be 1,961.4 acres, AR1028 at 5, 115; that is a total 561 acres (40%) more than the public was advised. Similarly, White Rock will be mining 941.7 acres, AR1928 at 115, compared to the 735.63 acres announced in the Revised Public Notice, AR737—a 28% increase.

**17.** The record indicates that the Corps' independent judgment also might be questioned as to one aspect of the mitigation plan for these permits. According to the Corps' CWA regulations, 33 C.F.R. 325.4(a), permits must include "reasonably enforceable" mitigation requirements. These mining permits provide that "[c]ompensatory mitigation for the eco-

■ The Corps analyzes practicable alternatives in light of a project's "overall purpose," which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve. However, "[a]n applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir.1989).

The Corps determined, as to these permits, that the "overall project purpose is to provide construction-grade limestone from Miami–Dade County." AR1028 at 8.[18] In considering all of the mining permit applicants collectively, as the miners requested, the Corps' practicable alternatives analysis only sought to identify potential alternative sites which could support a large scale limestone mining operation.[19] The draft EIS stated, without any supporting analysis, that there is a "difficulty of developing a foreign supply of rock to equal future demands in the next 15 years," AR605;

the Fish and Wildlife Service (FWS) and Everglades National Park criticized that document for not answering the question of whether there were alternative sources of rock, foreign or domestic, that could reduce the need to mine this quantity of limestone in these wetlands. Prior to publication of the EIS, the Corps received relevant information which specifically identified potential alternative sources for limestone products:

> [B]oth cement and aggregate are being brought into Florida ports [listing websites for ports in Tampa, Palm Beach, Jacksonville]. Ostensibly, these alternate sources are competing with Dade County stone and cement, and therefore should be looked at in the alternatives analysis and economic analysis in order to help determine what amount of mining crosses over from within the public interest, to excess wetland destruction that can be prevented while still being able to supply cement and aggregate from alternate sources outside of the Lake Belt to the rest of FL.

logical impacts to the wetlands associated with land clearing activities ... will be provided by acquiring, restoring and managing lands within the Pennsuco." *See, e.g.,* p. 4 of AR1055 (Permit issued to Sunshine Rock, Inc.). The Pennsuco is an area of wetlands designated for restoration, and one aspect of the mitigation plan for this mining is that any permittee owning land in the Pennsuco will transfer that land to the public so that the area may be protected from future mining or development. Although the EIS reports that the sale of permittees' land "will be negotiated with individual companies who agree in principle to sell at appraised value," AR614 at 99, the Corps admits that the agreement is merely a "gentleman's agreement," AR956, and acknowledges in the ROD that there is "no written commitment" for the miners to sell this land, AR1028 at 70.

18. The Corps identified the purpose of the proposed project in a June 2000 Public Notice (issued shortly after the final EIS) as: "Placement of fill related to excavation activities for

the purpose of limestone quarrying," AR623A, and repeated that statement in the March 2001 Revised Public Notice, AR737.

19. NEPA regulations provide that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." 33 C.F.R. Part 235 App. B(7)(b)(3). Because the Corps considered a large scope of analysis of the benefits of the proposed mining, the Corps should have analyzed impacts and alternatives similarly broadly. For example, in response to criticism that the employment benefits attributed to this proposed mining appeared to account for a larger area than the area of the proposed project, the Corps noted that the "review of benefits is not limited to just Miami–Dade County." AR614 at 918. This also impacted the weighing of "benefits which reasonably may be expected to accrue" from the mining as measured against the reasonably foreseeable detriments, as required by CWA regulations. 33 C.F.R. 320.4(a)(1).

AR558 at 5 (public comments submitted March 1998).[20]

In response to these federal agency concerns and public comments, the Corps obtained a report from the permit applicants, and published that report as Appendix I of the EIS, AR614 at 923 ("Analysis of the 'Practicability' of Non–Lake Belt Alternative Sources to Supply Florida's Demand for Basic Construction Materials," December 1999). The report, submitted by Paul Larsen on behalf of the mining interests, AR583, was accepted by the Corps without critical review or verification [21] despite the fact that its author's bias had been credibly questioned.[22] Moreover, the report's evaluation of the environmental consequences of mining at the alternative sites was explicitly based on only one source of data: "interviews with the individuals who secured environmental permits for each mine [i.e., the mining industry]." AR585.

There is no indication that the Corps independently investigated Larsen's claims or the alternative sources which were identified by others—indeed, the Corps' EIS fails to identify with specificity any potential replacement sources of limestone. Instead, the Corps described the Larsen report as the Corps' "complete analysis of [alternative sources]," AR614 at 906, and adopted the report—including the report's conclusion that practicable alternatives did not exist—as the Corps' own analysis.[23]

20. Also, at the evidentiary hearing, witnesses for the Intervenors testified that at least some alternative sources of rock could be found in the near future, e.g., 13 million tons could be found during the remand period. Dkt No. 352, p. 71 (citing Tr. 5957–58).

21. The Corps either conducted no independent review or, if such review occurred, it is not reflected in the administrative record. In October 1999, after receipt of Larsen's draft report, a Corps staff member noted that the Corps was not interested in funding an "independent analysis" and would agree to "let" the state Bureau of Land Reclamation review Larsen's analysis of alternative sites. AR587. Such review apparently never occurred. Administrative Record of FWS at 75.

22. In February 1996, Corps staff accused Larsen of providing "very biased" information. AR270. In November 1997, Everglades National Park staff noted that they would like to have someone impartial review Paul Larsen's "fiscal analysis" and asked the Corps if such a review was in progress. AR529. (Park staff also objected to the Corps' reliance on mining consultants' reports on hydroperiods. AR512.)

23. The Corps' socio-economic analysis also relied exclusively on a report submitted by the mining companies, based on data supplied by the permit applicants, AR614 at 871 ("The Economic Significance of Lake Belt Limestone Mining," James C. Nicholas, Ph.D., included as Appendix G of the EIS). The report included the following:

The development of Florida has transformed a small and economically deficient state into what will become the third largest state ... and one of the more economically prosperous.... The significance of the crushed limestone industry of the Lakebelt goes far beyond its local production, for it plays a vital role in the economic development of the state.

AR614 at 69. The Corps describes the Nicholas report as a "detailed discussion of the economic significance of Lakebelt mining activities and products" and portions of the EIS, including the text above, are copied verbatim from the consultant's report, without any recorded attempt to verify the information despite criticism from another federal agency that the "information in the Economic Appendix may have overly relied on data supplied by the industry and its representatives." AR614 at 915. The Environmental Protection Agency sought "independent assessment of the economic consequences of limestone mining from a source or sources with less obvious bias." *Id.* Although the Nicholas report disclosed that its "methodology ... was to distribute a written questionnaire to Lake Belt mining interests that constitute approximately 90% of mining and related activities within the Lake Belt," AR614 at 871, the Corps defended its total reliance on the report: "[the] economic analysis followed accepted principals [sic] and used the RIMMS methodology by the Department of Commerce .... [and we] rely on the professionalism of the prepares [sic] of the analysis unless we see or are

The Corps made no effort, or at least the record is silent as to any such effort, to independently evaluate any of the claims in Larsen's report relating to the lack of practicable alternatives.[24] It is not this Court's responsibility to determine whether the Larsen report is accurate or worthy of reliance, but based on this Court's review of the record, the Corps has not articulated a reasoned explanation for its adoption of the report and its conclusions.

Even after the EIS was published, the record indicates that the Corps did nothing else to address the question of practicable alternatives. Not a single alternative location is identified by name in the ROD. The ROD included a brief summary of the alternatives discussion in the EIS:

> Appendix I [of the EIS] provides an analysis of Non–Lake Belt Alternative Sources.... The Appendix describes the other alternative rock sites within and outside of Florida.... Most of these locations include quality wetlands or habitats.... Some of these alternative sites also have poor potential for expansion due to urbanization or other concerns.... Also, if rock mining operations were moved to the many smaller mines located throughout the State, there would be considerable costs to relocate the rail network, ... plants, and trucking infrastructure that currently

distributes the rock products from the Lake Belt.

AR1028 at 38–39 (emphasis added). The ROD also repeats the Larsen report's conclusions: "Rock product is only available in limited portions of the State. Slightly over 40% of the rock used in Florida comes from the Lake Belt.... Any change in the cost or availability will have wide repercussions across the state," AR1028 at 38, and "other locations would result in impacts to other ecosystems, and probably to a greater extent than in the Everglades since the area of mining would have to be larger and the other ecosystems are smaller than even the remaining extent of the Everglades," AR1028 at 84. These summary statements do not reveal that the Corps conducted an independent review of whether practicable alternatives existed, as required by 33 C.F.R. Part 325, App. B(9)(b)(4), and *Fund for Animals, Inc. v. Rice*, 85 F.3d at 543.

The record before me in this case fails to show that the Corps exercised independent judgment in rejecting all practicable alternatives to this proposed mining, particularly when compared to administrative records reviewed favorably by other courts. Noting the Corps' duty to conduct its own evaluation, the court in *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543, upheld the Corps' permitting decision where the

---

advised of an irregularity." *Id.* NEPA requires that the Corps evaluate reasonably foreseeable significant adverse effects, and consider "the environmental impact" of the proposed action, 42 U.S.C. § 4332(2)(c)(I). One court has observed that misleading information about economic impacts can defeat the "hard look" function of an EIS required by NEPA. *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005 (5th Cir.1980).

24. The Corps responded to an objection to the EIS by summarizing one of the tables in the Larsen report (the table was based on data

"obtained from U.S.G.S. publications and from mining industry sources," AR583 at 17).

> We have not prepared a formal cost benefit analysis of alternate sources of rock but the [Larsen report in EIS] includes a description of those sources.... [F]rom 2.1 to 3.9 acres of land at the alternate locations is needed to produce the same quantity of rock as 1 acre in the Lake Belt.... An elaborate cost-benefit analysis would add details but probably not contribute much additional information for the decision-maker.

AR637. The Court did not find this statement in the EIS or ROD.

Corps independently evaluated the applicant's analysis of several alternative sites before determining that there were no practicable alternatives. *Id.* at 543. The court in *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d at 1345–46, approved the Corps' "thorough review" of the applicant's characterization of the project, noting that the Corps had support for its definition of the project purpose as encompassing two severable projects: the non-water-dependent construction of a housing development and the water dependent provision of boat access to the development.[25] In *Friends of the Earth, Inc. v. Hintz*, 800 F.2d 822, the Corps had "exhaustively studied" the permit applicant's information, *id.* at 835, and engaged in a "reasonably thorough examination of the water dependency issue, and reached a rational conclusion," *id.* at 831, before approving the permit. "Certainly, we would not condone blind acceptance by the Corps of [an applicant's] study of alternative sites." *id.* at 836. The Corps' decision to issue a 404(b) permit was upheld in *Great Rivers*, 437 F.Supp.2d at 1028, because the Corps had required the permit applicant to undertake a "formal practicable alternatives analysis" and received public comments and responses thereto; the Corps also "considered and rejected proposed practicable alternative sites ... and articulated reasons for its decision as to practicable alternatives." *Id.* at 1030. Also, in *Alliance for Legal Action v. United States Army Corps of Eng'rs*, 314 F.Supp.2d 534 (M.D.N.C.2004), the court upheld the Corps' determination that the basic purpose of a proposed air cargo hub was not water dependent, finding that the record demonstrated that the "Corps did not unthinkingly adopt the EIS." *Id.* at 551.

Based on the record before me, I find that the Corps' conclusory statement that "there are no practicable nor less damaging alternatives which would satisfy the project's overall purpose," AR1028 at 59, and the lack of justification in the record, does not demonstrate that the Corps independently evaluated the question of practicable alternatives as required by 33 C.F.R. 325 App. B(9)(b)(4). "Alternatives might fail abjectly on economic grounds. But the Corps and, more important, the public cannot know what the facts are until the Corps has tested its presumption." *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669–670 (7th Cir. 1997) (vacating permit because Corps failed to evaluate entire category of reasonable alternatives for water supply). Also, the Corps' reliance on the Larsen report without independent evaluation of its claims does not comply with the requirements of NEPA, specifically 40 C.F.R. 1506.5(a), and provides further support for my conclusion that the Corps was arbitrary and capricious in concluding that there are no practicable alternatives to this mining.

In summary, after a deferential review of the Corps' unexplained decision that the activity proposed by these applicants required siting within wetlands, I find that the Corps' decision that this mining was water dependent was arbitrary and capricious, and plainly inconsistent with 40 C.F.R. 230.10(a). It is clear from the record that the Corps uncritically accepted the miners' assertions that limestone mining required siting in these specific wet-

---

**25.** The applicants' stated project purpose when the 50 year permit application was filed in May 2000 was to "[p]rovide Limestone materials for construction of public and private infrastructure throughout the State of Florida." Application for Permit on behalf of Kendall Properties & Investments. AR1040 at 3. The Court observes that the current Draft SEIS filed with the Court indicates that the Corps now views the project purpose as "to continue to provide high-quality, construction-grade limestone to the construction industry in Florida from the Lake Belt area." Dkt. No. 452 at 1–3.

lands, in the face of possible alternatives that were presented to the agency. By not applying the presumption that environmentally preferable and practicable alternatives to this limestone mining were available, the permit applicants were excused from "clearly" demonstrating the absence of practicable alternatives. This is not the process anticipated and mandated by 40 C.F.R. 230.10(a)(3), and this failure by the Corps constitutes arbitrary and capricious conduct. *See, e.g., Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986); *Sierra Club v. Martin,* 168 F.3d 1, 7 (11th Cir.1999).[26] Further, the Corps' decision to summarily reject all alternative locations for this mining was based on the Corps' uncritical acceptance of a single report from the permit applicants, as to which credible objections had been raised.[27]

Insofar as the CWA practicable alternatives analysis is concerned, the Corps' decision to grant these permits was arbitrary and capricious. Plaintiffs are entitled to summary judgment. Moreover, the conclusions reached by the Corps did not comply with the procedural safeguards of the CWA and NEPA regulations which control the Corps' activities, as noted above, and on that separate and independent basis are arbitrary and capricious. Plaintiffs are entitled to summary judgment.

## II. Analysis of the "no action" alternative pursuant to NEPA

Apart from the analysis required under the CWA as to practicable alternative locations for the proposed limestone mining, NEPA also directs the Corps to evaluate alternatives which include, e.g., taking "no action" by denying the permits, or any reasonable alternatives, in order to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. 1502.14. The EIS must demonstrate that the Corps complied with NEPA's requirements to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. 1502.14(a).[28]

---

**26.** In the NEPA context, a court has observed that "[w]hat other alternatives exist we do not know, because the Corps has not looked." *Simmons v. United States Army Corps of Eng'rs,* 120 F.3d at 670.

**27.** Plaintiffs also criticized the Corps' reliance on an endangered species report submitted by mining industry consultants for the Corps' analysis of effects on protected species. A state agency's report in late 2001 indicated that almost 90% of all endangered wood storks located in Everglades National Park were nesting directly adjacent to the mining project area and would be adversely affected—thus contradicting information submitted by the mining industry, relied upon by the Corps, AR944, and announced to the public. For example, the Public Notices had reported that the proposed mining would have "no effect" or was "not likely to adversely effect" any protected species, but FWS had observed that no biological evaluation was included in either of the Public Notices issued by the

Corps, nor had the EIS provided a thorough analysis of the potential effects—including cumulative effects—on protected species. AR824. The Corps identified Annex A of the EIS as a "Biological Opinion," but that document, a letter from FWS to the Corps, specifically states that it "does not constitute a Biological Opinion." AR614 at 119. After this Court initially granted summary judgment for Plaintiffs in 2006, a Biological Opinion was completed, Dkt No. 241, announcing for the first time that the wood stork will be adversely affected and that a "take" of the species is occurring from the ongoing mining, *id.,* at 57.

**28.** "Those alternatives that are unavailable to the applicant, . . . should normally be included in the analysis of the no-Federal-action (denial) alternative. Such alternatives should be evaluated only to the extent necessary to allow a complete and objective evaluation of the public interest and a fully informed decision regarding the permit application." 33 CFR Part 235 App. B(9)(b)(5)(a).

The EIS issued in 2000 summarily dismissed the "no action" alternative of continuing to review permit requests case by case because of a "strong consensus among the environmental resources agencies and groups that the current wetland mitigation requirements [resulting from prior approval of individual permits] do not adequately compensate for the resulting wetland impacts." AR614 at 71.

The "no action" alternative of revoking the then-existing permits (and denying any future mining permits) was dismissed because of "the legal issues arising from" such action by the Corps, and the "economic hardships imposed on the mining industry." AR614 at 71. Similarly, the ROD dismissed the "no action" alternative:

> While there is a possibility that adverse effects may occur despite the referenced measures [possible actions to minimize risk, etc.], there may be a risk to the Government in denying landowners use of their property based upon such 'possibilities.'... [Discussion of takings case brought by one of the mining companies and government.] The alternative to this costly process would be public acquisition of the lands. However, the Corps is not a land management agency and does not have the necessary congressional authorization or funding to acquire conservation lands.

AR1028 at 37. Based on the Corps' statements quoted above, it is clear that the Corps' decision to issue the permits was at least in part based on the Corps' belief that financial costs to the United States, i.e., from inverse condemnation actions by the miners (which may or may not succeed), might result from any prohibitions or limits on the proposed limestone mining.

The Corps apparently thought that the risk of this outcome was unacceptable, and therefore narrowed the universe of possible alternatives to those that would allow the miners to mine their property. After rejecting the "no action" alternatives, the Corps concluded that: "[t]he proposed 10–year mining footprint is the least damaging to the aquatic ecosystem in that it is much smaller than the 50–year total plan (which itself minimizes impact to wetlands compared to other alternatives described in the fifty year analysis)." AR1028 at 36–40, 55. As the Corps presently is preparing an SEIS, and in light of the Court's finding, discussed above, that the Corps' analysis of alternatives under the CWA was arbitrary and capricious, the Court need not further address the merits of the Corps' "no action" alternatives analysis at this time.

### III. Analysis of impacts pursuant to the CWA and NEPA

 NEPA has been interpreted to require that courts "ensure that the agency took a 'hard look' at the environmental consequences of the project," *City of Oxford v. F.A.A.,* 428 F.3d 1346, 1352 (11th Cir.2005). The CWA also "requires that an environmental concern ... be considered at an early enough stage in the policymaking process to affect the agency decision," *Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1051 (2d Cir.1985). The Corps' CWA regulations require that analysis of a proposed activity begin with the presumption that the "unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest," 33 C.F.R. 320.4(b)(1), and impacts to those wetlands which perform functions "important to the public interest" should be avoided, 33 C.F.R. 320.4(b)(2). The 404(b) Guidelines also provide that the "guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources" and "is considered to be among the most se-

vere environmental impacts." 40 C.F.R. 230.1(d).[29]

Permits should not issue under the CWA for activities that will cause or contribute to "significant degradation" of the wetlands at issue, 40 C.F.R. 230.10(c), [e.g., activities which might cause significantly adverse effects on municipal water supplies, wildlife habitat, etc., 40 C.F.R. 230.10(c)(1), (3) ]. The statute specifically provides that unacceptable adverse effects on municipal water supplies are sufficient grounds for denial of a 404(b) permit, 33 U.S.C. § 1344(c), and pertinent regulations direct that the Corps consider water quality and water supply issues as part of its "Public Interest Review," 33 C.F.R. 320.4(a)(1).

During the preparation of the EIS and prior to issuance of the ROD, the Corps was urged by several local agencies to address the potential adverse effects on Miami–Dade County's municipal water supply from the proposed limestone mining activity, and the costs associated with mitigating those effects. The Court must decide whether the Corps considered, as required by the CWA and its implementing regulations, as well as NEPA, the significant adverse effects on municipal water supplies (which were a reasonably foreseeable result of this mining).

The county protects the quality of the Northwest Wellfield by enforcing protection zones around the production wells, based on the theoretical distance a pollutant might travel toward a production well during a specific number of days. AR1175, p. 6, 9. Limestone mining, which removes the rock and leaves pits which fill with water, affects the effectiveness of those protection zones:

> [Limestone] makes up the Biscayne aquifer, which stores and filters the wa-

ter supply for Miami–Dade County. Removal of the aquifer material by rock mining leaves the remaining aquifer more vulnerable to contamination from the newly created surface water bodies.... Implicit in the creation of wellfield protection zones is the assumption that the hydrogeologic parameters do not vary in time. However, the very nature of rock mining, removing the geologic material, negates this assumption. There is a concern that existing and future rockmining excavations serve to expand the travel time contours beyond those used to define the existing wellfield protection area.

AR1176 ("Description and Analysis of Full–Scale Tracer Trials Conducted at the Northwest Wellfield, Miami–Dade County Florida," Miami–Dade County environmental department report, August 2000).

One of the County's most important concerns is that the Aquifer not be subject to reclassification as "groundwater under the direct influence" of surface water-such a reclassification (from the present classification as "'groundwater") would require a costly modification of the County's water treatment facilities. AR1175 (Northwest Wellfield Watershed Protection Plan, prepared for the State water agency by Miami–Dade County's environmental department, August 16, 2000). The County's municipal water department criticized the draft EIS as follows:

> [The EIS for fifty years of limestone mining] does not provide reasonable assurance that the Plan will protect the wells from contamination by surface water influence .... [and avoid] two adverse impacts: Public health risk—the influence from surface water increases the risk of introducing disease—causing

---

**29.** NEPA also requires analysis of the environmental impacts of a proposed action, including direct, indirect, and cumulative impacts, 42 U.S.C. § 4332(2)(c)(i), 40 C.F.R. 1502.1, 1502.14, 1502.16, 1508.7, 1508.8.

microbial contaminants ... in the water supply.... Economic—the water treatment plants' process will have to be modified to provide additional filtration and disinfection which is required for surface water sources. The estimated cost of these improvements is $235 million.

AR608 (letter from Director, Miami–Dade Water and Sewer Department, to Corps, May 28, 1999).[30] Although the final EIS reported that the excavation of limestone would convert a large portion of the Aquifer to "surface waters," AR614 at 78, that Miami–Dade County's wellfield protection plan's buffer zone "may be inadequate protection against [potentially deadly] surface water contaminants," AR614 at 69–70, and that the proposed mining plan "may compromise the existing wellfield protection program," AR614 at 88, nowhere does the EIS mention the potential $235 million cost of upgrading the water treatment plants.[31]

The EIS identifies three mitigation measures to protect the wellfields: the construction of a berm around the larger mining area to prevent direct entry of surface water runoff, the prohibition of future development, and the use of land use regulations to prevent urban runoff into the wellfield, AR614 at 82–83. The EIS does not include mitigation measures to address the risk of the Aquifer becoming contaminated by the mining itself, and is silent as to the estimated cost for upgrades to the County's water treatment systems which would be necessary if the Aquifer is reclassified as groundwater under the direct influence of surface water.

NEPA and its regulations impose a duty on the Corps, when evaluating "the environmental impact of the proposed action," 42 U.S.C. § 4332(2)(C)(i), to provide all available information that is "essential to a reasoned choice among alternatives," 40 C.F.R. 1502.22. By failing to include in the EIS the County's estimates of the costs of the potential upgrades to the water treatment system, or any analysis by the Corps as to whether such upgrades were reasonably foreseeable, the Corps did not comply with NEPA's regulations.

After reviewing the EIS and the Corps' Public Notice of the intent to issue the permits, the County advised the Corps that:

> Quarry lakes have the potential to contain substantially more disease-causing organisms than groundwater.... Mining rock from the Biscayne aquifer in the vicinity of the wellfield decreases the time it takes for a contaminant to travel from the quarry lake to the wells. Rockmining that may be authorized by the proposed Federal action will exacerbate the existing footprint of lakes in the vicinity of the wellfield. Therefore, the proposed Federal action has the potential to increase the risk of water quality contamination at the wellheads and result in the necessity for upgrading the water treatment plants to treat for disease-causing organisms at the cost of approximately $250,000,000.

AR654 (letter from Miami–Dade County to Corps, July 19, 2000); *see also* AR656

---

**30.** In May 1999, Miami–Dade County's environmental department also announced that it could not support the EIS until water quality and buffer issues were addressed fully, and that it could cost at least $235 million to add more filtration and disinfection to Northwest Wellfield "if groundwater becomes under direct influence of surface water as a result of mining". AR605 at 85.

**31.** The CEQ regulations and NEPA mandate that environmental information be available to officials and the public before decisions are made, 40 C.F.R. 1500.1(b), in order to help public officials make decisions "based on understanding of environmental consequences," 40 C.F.R. 1500.1(c).

(letter from Miami–Dade municipal water department to Corps, July 21, 2000). Despite these concerns, summarized in the ROD in a section reporting on comments received, AR1028 at 15, 33, the Corps never addresses the County's estimated costs of upgrading the water treatment facilities in the Corps' analysis of the foreseeable adverse effects of the proposed mining.[32]

In the alternatives analysis, the ROD includes the statement that "[i]f the wellfield is reclassified to [ground water under the influence of surface water] existing water treatment plants would have to be upgraded," AR1028 at 54, without mentioning the estimated costs of the upgrade—a secondary or indirect effect of the proposed mining activity. Although the Corps identifies the potential contamination as a secondary effect, "[t]he removal of the rock and muck increase the potential that contaminants from runoff could enter the aquifer and reach the public wellfield," it does not discuss mitigation of those adverse environmental impacts, 40 C.F.R. 1502.16, instead claiming that the risk will be reduced by "additional restrictions," AR1028 at 59.

 The Corps' evaluation of the 404(b)(1) Guidelines concludes that "there are no factors ... that would cause an adverse water quality impact," AR1028 at 57,[33] and while the Corps finds that there is a "potential for introduction of contaminants from accidental spills during mining operations or from runoff from workpads or other adjacent land uses," AR1028 at 57, that risk will be minimized as "mining will not occur [in some locations near the wellfield]." AR1028 at 73.[34] Failing to

32. The County's stated concern about upgrades to the water treatment systems may be particularly prescient, in hindsight. The Court notes that benzene, which had been sporadically detected in county sampling since January 2001, Plaintiffs' Exh. 203, Tr. 6551, appeared in the water delivered to the county's water treatment plant in early 2005 at levels which "are several times higher than had been previously detected anywhere in the vicinity of the [wellfield]." Dkt. No. 366 (Executive Summary of Northwest Wellfield Benzene Investigation, prepared by Miami–Dade County environmental department, February 2007), p. 3. Also, at the evidentiary hearing before this Court in 2006, the former Director of WASD testified that upgrades to the treatment plant would not have been necessary but for the encroachment of the limestone mining pits. Tr. 1575 (Brant). My decision today does not rely in any part on this information, and I include it in this order solely to provide a current context to this decision.

33. The Court notes that after the permits were issued by the Corps, the County hired the United States Geological Survey (USGS) to perform several field studies. Notably, the studies in 2003 revealed a much faster transmissivity in the Aquifer than expected. Despite the almost universal understanding that the Wellfield protections on which these challenged permits are based are inadequate, see e.g., the USGS study (Plaintiffs' Exh. 9, p. 319, Plaintiffs' Exh. 23, and County reports: Tr. 431) (Dr. Markley), Tr. 4248–49, 4276 (Dr. Yoder), Tr. 1438–40 (Brant), the Corps ignored specific evidence presented by Plaintiffs in early 2004 that the Wellfield protections are "no longer accurate." SAR1317 (Letter from NRDC to Corps, dated February 16, 2004). The Corps admitted that it never discussed the 2003 USGS study with the USGS. Tr. 2751 (Studt), despite the "Three Year Review" reporting and the water quality monitoring conditions relied upon in the 404(b)(1) analysis reported in the ROD.

34. The Corps reports that there is a "risk of contamination to the public wellfield," AR1028 at 55, but this is dismissed as insignificant because there are "additional interim restrictions" on the mining, and a "review is scheduled three years after permit issuance to minimize the potential that the adverse effect [on the wellfield] will occur." Id. The 404(b)(1) Guidelines provide that permits may issue for activities if "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge," 40 C.F.R. 230.10(d). See also, Fund for Animals, Inc. v. Rice at 544 (where filling of wetlands cannot be avoided, appropriate and practicable steps must be taken to mini-

mention in the evaluation of the Guidelines that if the wellfield is reclassified as a result of the mining activity the public costs of the upgrades would be approximately $235–$250 million indicates that the Corps failed to account for those costs in its analysis of whether these permits would have a significant effect on the environment. "NEPA imposes procedural requirements before decisions are made in order to ensure that those decisions take environmental consequences into account." *Wilderness Watch v. Mainella,* 375 F.3d 1085, 1096 (11th Cir.2004). Thus, the Corps' decision, announced in the ROD, that these permits would have no significant effects other than those studied in the EIS was arbitrary and capricious because the EIS itself did not meet NEPA's procedural requirements as to the study of indirect effects and their significance. 40 C.F.R. 1502.16, 1508.8.[35]

### CONCLUSION

As discussed above, I have determined that the Corps acted arbitrarily and capriciously in concluding that this limestone excavation is water dependent and that no practicable alternatives existed. The Corps failed to articulate any explanation for its determination that the basic purpose of this project was water dependent, and failed to document any "analysis" of the practicable alternatives to this proposed mining, in violation of both the CWA and NEPA. Moreover, by failing to hold these limestone corporations to the test of "clearly demonstrating" the absence of practicable alternatives, the Corps failed to comply with 40 C.F.R. 230.10(a)(3).

The EIS also failed to meet NEPA's requirements because the Corps adopted challenged data and conclusions submitted by the permit applicants without independent evaluation, and omitted pertinent information related to the anticipated cost of upgrades to the water treatment plants. Based on the record before the Court, the Corps was arbitrary and capricious in determining that the ten year permits would have no significant effect other than identified in the EIS, in part because the EIS itself was insufficient to meet NEPA's demands.

The Corps failed to comply with statutory and regulatory directives and was arbitrary and capricious in its decision to issue the permits. The Corps' decision to issue these permits in 2002 must be set aside. The Court's decision today, and in the past, has been based on a full review of the record before me, and my understanding of the law. I have approached this case, as any other, with the intent to fulfill my commission as a judge fairly and fully, to the best of my ability.

mize potential adverse impacts of the discharge on wetlands).

**35.** The Corps' evaluation under the CWA of the "benefits which reasonably may be expected to accrue from the proposal ... balanced against its reasonably foreseeable detriments," required before issuing a 404(b) permit, 33 C.F.R. 320.4(a)(1), also may have been compromised by the failure to account for the costs to the municipal water treatment system. The Intervenors argue that the limestone mining provides benefits, including the collection of mitigation fees to facilitate restoration of wetlands in compensation for those destroyed by the mining, the provision of available limestone for construction projects related to Everglades restoration, and the avoidance of costly expenses of acquiring these wetlands from the mining industry. The Corps presently is tasked with balancing those alleged benefits against the future costs related to necessary upgrades to the water treatment plants (and the investigation of the benzene contamination incident arguably caused by the mining activities), and other reasonably foreseeable detriments. The Court declines to address these issues as to the administrative record presently before the Court because of the Corps' ongoing evaluation of these issues related to preparation of the SEIS.

Plaintiffs' motions for summary judgment are GRANTED as to Counts I and V, and the motions filed by the Corps and Defendants–Intervenors are DENIED. The Court hereby enters judgment in favor of Plaintiffs and against the Corps.[36] This case is closed.

---

**36.** As of late 2006, several of the permittees had little acreage remaining to be mined under these permits, and nothing remaining to be devegetated. For example, Tarmac was "running up against the end of … [their] ten-year permitting," and had cleared "virtually everything" they had a permit to clear. Tr. 5064 (Townsend). It may be that very little discharge of dredged or fill material currently is occurring and the practical effect of this Court's order, or the nature of relief to Plaintiffs, may be minimal.